FLORIDA DEPARTMENT OF STATE *v.* TREASURE
SALVORS, INC., ET AL.

No. 80–1348.   Argued January 20, 1982—Decided July 1, 1982

672

STEVENS, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and MARSHALL and BLACKMUN, JJ., joined. BRENNAN, J., filed an opinion conncurring in the judgment in part and dissenting in part, *post*, p. 700. WHITE, J., filed an opinion concurring in the judgment in part and dissenting in part, in which POWELL, REHNQUIST, and O'CONNOR, JJ., joined, *post*, p. 702.

*Susan Gamble Smathers*, Assistant Attorney General of Florida, argued the cause *pro hac vice* for petitioner. With her on the briefs were *Jim Smith*, Attorney General, and *Sidney H. McKenzie III*.

*David Paul Horan* argued the cause and filed a brief for respondents.*

---

*A brief for the State of Alabama et al. as *amici curiae* urging reversal was filed by *Rufus L. Edmisten*, Attorney General of North Carolina, *W. A. Raney, Jr.*, Special Deputy Attorney General, and *Daniel C. Oakley*, Assistant Attorney General; *Charles A. Graddick*, Attorney General of Alabama; *Wilson L. Condon*, Attorney General of Alaska; *Robert C. Hight, Jack E. Rump; Tany S. Hong*, Attorney General of Hawaii; *Tyrone C. Fahner*, Attorney General of Illinois; *William J. Guste, Jr.*, Attorney General of Louisiana; *Stephen H. Sachs*, Attorney General of Maryland; *Francis X. Bellotti*, Attorney General of Massachusetts; *William A. Allain*, Attorney General of Mississippi; *Daniel R. McLeod*, Attorney General of South Carolina; *Mark White*, Attorney General of Texas; *Donald M. Bouton*, Acting Attorney General of the Virgin Islands; *Aviata F. Faalevao*, Attorney General of American Samoa; and *Jack Avery*, Attorney General of the Government of Guam.

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE MARSHALL, and JUSTICE BLACKMUN joined.

In this admiralty *in rem* action, a federal court attempted to arrest property held by two state officials and bring it within the jurisdiction of the court. The property—artifacts of the *Nuestra Senora de Atocha*, a 17th-century Spanish galleon—was discovered by respondents on the floor of the ocean in international waters. The question presented is whether the Eleventh Amendment immunized the property from the federal court's process.

I

Battered by a tropical hurricane, the *Nuestra Senora de Atocha*, a Spanish galleon carrying a cargo of New World treasure to King Philip IV of Spain, sank in 1622, 40 nautical miles west of what is today Key West, Fla. After years of searching the ocean floor and studying Spanish archives in Seville, respondent Treasure Salvors[1] located the wreck site in the spring of 1971 near shoals known as the "Quicksands," nine and one-half nautical miles west of the Marquesas Keys.[2]

The State of Florida immediately claimed that the *Atocha* belonged to the State. The State claimed ownership pursuant to Fla. Stat. § 267.061(1)(b) (1974), which then provided:[3]

> "It is further declared to be the public policy of the state that all treasure trove, artifacts and such objects having intrinsic or historical and archeological value *which have been abandoned on state-owned lands or*

---

[1] The two respondents in this action, Treasure Salvors, Inc., and Armada Research Corp., were organized by the same parties. Throughout these proceedings they have been treated as a single entity referred to as "Treasure Salvors."

[2] The story of the *Atocha* and its discovery is recounted in Lyon, The Trouble with Treasure, 149 National Geographic 787 (1976).

[3] The statute since has been amended in a manner not relevant to this case.

674

*state-owned sovereignty submerged lands* shall belong to the state with the title thereto vested in the division of archives, history, and records management of the department of state for the purpose of administration and protection." (Emphasis added.)

Officials of the Florida Division of Archives threatened to arrest Mel Fisher, president of Treasure Salvors, and to confiscate the boats and equipment of Treasure Salvors if it commenced salvage operations on the *Atocha* without a salvage contract from the State. Under this threat of arrest, Treasure Salvors executed a one-year contract with the State that permitted it to conduct underwater salvage operations on the vessel.[4] Similar contracts were executed during each of the three succeeding years.

Each of the contracts was expressly predicated on the assumption that the *Atocha* was the property of the State of Florida because it had been found on submerged lands within the boundaries of the State. The contracts permitted Treasure Salvors "to conduct underwater salvage from and upon certain submerged sovereignty lands of and belonging to the State of Florida." App. 20. After describing in metes and bounds an area claimed to be "lying and being in Monroe County, Florida," the contract provided that the shipwreck site "is to be worked for the purpose of salvaging abandoned vessels or the remains thereof including, but not limited to, relics, treasure trove and other materials related thereto and located thereupon and therein, *which abandoned material is the property of the State of Florida.*" *Id.*, at 22 (emphasis added). The contract further provided:

―――――――――

[4] The District Court found that the contract was entered into as a result of the "coercive acts of the Division of Archives in threatening arrest and confiscation." *Treasure Salvors, Inc.* v. *Unidentified Wrecked and Abandoned Sailing Vessel,* 459 F. Supp. 507, 522 (SD Fla. 1978). The State admits that if Treasure Salvors had salvaged without a contract arrests would have been made. Tr. of Oral Arg. 9.

"In payment for the Salvager's satisfactory performance and compliance with this Agreement, the Division will award to the Salvager seventy-five percent (75%) of the total appraised value of all material recovered hereunder, which payment shall be made at the time division of such material is made by the parties hereto. Said payment may be made in either recovered material or fair market value, or in a combination of both, at the option of the Division's director." *Id.*, at 32–33.

The bargain, in brief, was between the Division of Archives, as the owner of the *Atocha* and its cargo, and Treasure Salvors, as a contractor that agreed to perform services for the Division. Treasure Salvors agreed to pay the Division $1,200 each year, to post a performance bond, and to perform its work in a specified manner, all in exchange for the Division's agreement to transfer ownership of 75% of the proceeds of the operation—or its equivalent—to Treasure Salvors. The contracts did not purport to transfer ownership of any property to the Division of Archives; the State's claim to the property was predicated entirely on a provision of state law.

In its attempt to salvage the lost treasure of the *Atocha*, Treasure Salvors was immensely successful. The salvager held some of the artifacts at its headquarters in Key West, while state officials held the remainder at the Division of Archives in Tallahassee. All of the property was deemed to belong to the State, however, subject to a subsequent distribution in which Treasure Salvors would receive its 75% contractual share.

In proceedings unrelated to the salvage operation, the United States and the State of Florida were engaged in litigation to determine the seaward boundary of submerged lands in the Atlantic Ocean and the Gulf of Mexico in which the State had rights to natural resources. In February 1974, a Special Master filed a Report that defined Florida's

boundary landward of the site of the wreck of the *Atocha*. The State's objections to the Report were overruled. *United States* v. *Florida*, 420 U. S. 531 (1975).[5] A final decree was entered providing that, as against the State of Florida, the United States was entitled to the lands, minerals, and other natural resources in the area in which the remains of the *Atocha* had come to rest. *United States* v. *Florida*, 425 U. S. 791 (1976).[6]

After this Court overruled Florida's exceptions to the Special Master's Report, Treasure Salvors filed a complaint in the Federal District Court for the Southern District of Florida demanding that "Plaintiffs be put into possession of the ATOCHA and other property and that all other persons, firms, and corporations or government agencies be enjoined from interfering with Plaintiffs title, possession, and property," and that "Plaintiffs title be confirmed against all claimants and all the world." App. 9. The complaint invoked the court's admiralty and maritime jurisdiction pursuant to Federal Rule of Civil Procedure 9(h) and, as an admiralty action *in rem*, named the *Atocha* as defendant. Items recovered from the *Atocha* in Treasure Salvors' possession were duly served with process and brought into the custody of the court. Most of the remainder of the wreck and its valuable cargo lay buried under sand in international waters; state officials held other artifacts in Tallahassee. No attempt was made at this time to serve the artifacts in Tallahassee.

The United States intervened in the action as a party-defendant and filed a counterclaim seeking a declaratory judgment that the United States was the proper owner of the

---

[5] In its exceptions to the Special Master's Report, the State contended that the Master should have recognized that the boundaries of the State extended to the boundaries defined in the State's 1868 Constitution, rather than to the limits specified in the Submerged Lands Act of 1953. See 420 U. S., at 532. This Court considered that exception and held that the Master had properly rejected the State's argument. *Id.*, at 533.

[6] This area is on the Continental Shelf of the United States, in international waters. *Treasure Salvors, Inc.* v. *Abandoned Sailing Vessel*, 408 F. Supp. 907, 909 (SD Fla. 1976).

*Atocha.*[7] The District Court rejected the Government's claim of ownership and held that "possession and title are rightfully conferred upon the finder of the res derelictae." *Treasure Salvors, Inc.* v. *Abandoned Sailing Vessel,* 408 F. Supp. 907, 911 (1976). The court entered judgment in favor of Treasure Salvors "against the United States of America and all other claimants." Record 270.[8]

The Court of Appeals affirmed the judgment of the District Court as against the United States, but modified its decree. *Treasure Salvors, Inc.* v. *Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F. 2d 330 (CA5 1978). The United States had argued that the District Court lacked *in rem* jurisdiction to determine rights of the parties to that portion of the *Atocha* lying beyond the territorial jurisdiction of the court. The Court of Appeals agreed that the District Court lacked *in rem* jurisdiction over those portions of the res located outside the district; the court noted that for a court to exercise admiralty *in rem* jurisdiction the res itself must be brought within the district and seized by the court. *Id.,* at 333. The appellate court held, however, that by intervening in the action and stipulating to the court's admiralty jurisdiction the Government had "waived the usual requirement that the *res* be present within the territorial jurisdiction of the court and consented to the court's jurisdiction to determine

---

[7] The United States asserted a right of ownership under several federal statutes and the common-law doctrine of "sovereign prerogative." The State of Florida did not intervene at this time. It had notice of the litigation, however, and both assisted the United States in the lawsuit and entered into preliminary negotiations with the United States Department of the Interior regarding disposition of the *Atocha*'s treasure in the event the Federal Government prevailed. See 621 F. 2d 1340, 1343–1344 (CA5 1980).

[8] The court explained: "General principles of maritime and international law dictate that an abandonment constitutes a repudiation of ownership, and that a party taking possession under salvage operations may be considered a finder under the doctrine of 'animus revertendi,' i. e., the owner has no intention of returning. Ownership in the vessel would then vest in the finder by operation of law." 408 F. Supp., at 909 (citation omitted).

its interest in the extraterritorial portion of the vessel." *Id.*, at 335. The court concluded that jurisdiction thus existed to determine claims of the United States to those portions of the *Atocha* lying beyond the territorial jurisdiction of the court, but not claims of other parties who had not appeared and submitted to the jurisdiction of the court.[9] On the merits, the Court of Appeals rejected the statutory and common-law claims advanced by the United States.

Throughout these proceedings, valuable artifacts of the *Atocha* remained in the custody of officials of the Florida Division of Archives in Tallahassee. Since Tallahassee is located in the Northern District of Florida, these artifacts also were located beyond the territorial jurisdiction of the District Court. Immediately following the decision of the Court of Appeals, Treasure Salvors filed a motion in the District Court for an order commanding the United States Marshal to arrest and take custody of these artifacts and bring them within the jurisdiction of the court. Record 318. That motion forms the basis of the present controversy.

The District Court issued a warrant to arrest.[10] Although

---

[9] The court stated:

"[T]he district court properly adjudicated title to all those objects within its territorial jurisdiction and to those objects without its territory as between plaintiffs and the United States. In affirming the district court, we do not approve that portion of its order which may be construed as a holding that plaintiffs have exclusive title to, and the right to immediate and sole possession of, the vessel and cargo as to other claimants, if any there be, who are not parties or privies to this litigation." 569 F. 2d, at 335–336 (footnote omitted).

[10] The warrant provided:

"WARRANT FOR ARREST IN REM

"THE PRESIDENT OF THE UNITED STATES OF AMERICA

"TO: THE MARSHAL OF THE UNITED STATES FOR THE
    SOUTHERN DISTRICT OF FLORIDA

"GREETING:

"WHEREAS, on the 18th day of July, 1975, Treasure Salvors, Inc., a corporation and Armada Research Corporation, a corporation, filed a Com-

the warrant was addressed to two officers of the Division of Archives, the State itself filed a motion to quash the warrant, contending that the State of Florida was not a party in the case and had not waived the requirement that the court could exercise *in rem* jurisdiction only over that portion of the res within the territorial boundaries of the court. App. 43.[11] The State also sought and obtained an emergency stay from the Court of Appeals. Record 368. The District Court denied the motion to quash, ruling that the extraterritorial seizure was proper under Supplemental Admiralty Rule C(5).

---

plaint under Rule 9(h) against the Unidentified Wrecked and Abandoned Sailing Vessel, her tackle, armament, apparel and cargo located with 2500 yards of a *[sic]* at coordinates 24° 31.5' North Latitude and 82° 20' West Longitude, said sailing vessel believed to be the NUESTRA SENORA DE ATOCHA for the reasons in said Complaint, and

"WHEREAS, in November of 1975 Notice of said claim was published in a newspaper of general circulation within the District, and

"WHEREAS, the State of Florida nor any of its agencies, agents, or employees, did appear in this cause to defend or prosecute any claim that they might have to any portions of said vessel that were in their possession, custody, care or control.

"NOW, THEREFORE, you are hereby commanded to take into your possession the portions of said vessel which have been in the possession or are in the possession of L. Ross Morrell and/or James McBeth, or under their custody, care or control and to bring said portions of said vessel within the jurisdiction of this Honorable Court and transfer possession of same to the substitute custodian appointed in this action." App. 40–42.

[11] The State also asserted:

"A contract was entered into between Armada Research Corporation and the State of Florida on December 3, 1974 and was for a good and valid consideration. The contract alone determined the rights and obligations of the contracting parties and was in no way affected by [the decision of this Court in] United States v. Florida. This contract was fully executed and performed prior to the United States v. Florida *[sic]*." *Id.*, at 44.

In response to the State's assertion that the contracts determined the rights of the contracting parties, Treasure Salvors filed a supplemental complaint in federal court. Record 369. The complaint sought a declaratory judgment that the contracts between Treasure Salvors and the State were void.

App. 51.[12]  Since the Court of Appeals had stayed execution of the warrant, the District Court issued an order to show cause why the State should not deliver the artifacts into the custody of the Marshal.[13]

In response to the order to show cause, the State raised several substantive issues in the District Court.  Record 425.  Contending that a supplemental complaint filed by Treasure Salvors, see n. 11, *supra*, demonstrated that the State of Florida was a defendant in the action, the State argued that the Eleventh Amendment barred an exercise of the court's jurisdiction.  The State also repeated its arguments that the court lacked *in rem* jurisdiction in admiralty because the res was not present within the district and that the decision of this Court in *United States* v. *Florida* did not affect the State's "contractual" right to a share of the artifacts.  Record 429–439.

The District Court rejected these arguments in a comprehensive memorandum.  *Treasure Salvors, Inc.* v. *Unidentified Wrecked and Abandoned Sailing Vessel*, 459 F. Supp. 507 (1978).  The court first held that, just as all claims of the

---

[12] The court also held that, in light of the State's claim that it had a contractual right to 25% of the res, "the State of Florida has waived the general requirement that the *res* be within the territorial jurisdiction of the court and, further, has consented to the court's jurisdiction over its interest in any portions of the vessel."  App. 59.

[13] The Court of Appeals then dissolved the emergency stay.  *Id.*, at 65. The court ordered: "The United States Marshal may execute the warrant of arrest and upon doing so shall forthwith deliver custody of all of the items in question to a custodian who will take possession of them *in situ* and shall place them under lock or seal at their present location and hold them secure."  *Id.*, at 68.  The appellate court denied a motion for reconsideration that had contended that the District Court lacked jurisdiction.  "The question of the jurisdiction of the District Court for the Southern District of Florida is for that court to determine in the first instance on the basis of such record as may be developed in that court."  *Id.*, at 69. To expedite the litigation, Treasure Salvors agreed to permit the State to serve as substitute custodian.  The warrant was executed and, with the State serving as custodian, the artifacts came into the control of the United States Marshal.

United States had been resolved in the earlier proceeding, all claims of the State were barred because the State of Florida had acted in privity with the United States in that proceeding. *Id.*, at 512; see n. 7, *supra.* Alternatively, the court held that the extraterritorial arrest of the salvaged articles was proper under Supplemental Admiralty Rule C(5) and that the court thus had obtained jurisdiction *in rem* to resolve ownership of the res. 459 F. Supp., at 518. On the merits, the court rejected on multiple grounds the State's contractual claim to the property. *Id.*, at 521.

At the conclusion of its memorandum opinion, the court rejected the State's Eleventh Amendment defense. *Id.*, at 526. The court first held that the State necessarily had waived the Amendment as to any claim to the property that it asserted in federal court. *Ibid.* The court then held that, apart from any claim advanced by the State, the Eleventh Amendment did not bar the seizure of the artifacts and subsequent transfer to the custody of the Marshal.[14]

---

[14] The court asserted several grounds in support of this decision. Essentially, the court held: "There is no Eleventh Amendment bar to the mere arrest of articles of salvage unless the state is the owner. If the state is not the owner, the court may proceed." 459 F. Supp., at 527. The court concluded that ownership is thus a "jurisdictional" fact and, citing *United States* v. *Mine Workers,* 330 U. S. 258, noted that "[i]t is axiomatic that the federal courts have jurisdiction to determine jurisdiction." 459 F. Supp., at 527. The court held that no Eleventh Amendment bar existed because "[t]his Court finds as fact that the Division of Archives is not and never was the rightful owner of the articles of salvage from the ship *Atocha* that were seized by the ancillary warrant of arrest and which have been improperly removed and held by the Division of Archives; that the Division of Archives is not the owner of any right or interest in such property based upon the purported and invalid contract with Treasure Salvors; and that the Division of Archives was wrongfully withholding a portion of the *res* of the *Atocha* over which this Court was properly exercising *in rem* jurisdiction." *Ibid.*

On the basis of its memorandum, the court

"ORDERED and ADJUDGED and DECREED that Treasure Salvors, Inc. and Armada Research Corp. have full right and title to articles arrested and that they are entitled to possession and that the United States

The Court of Appeals affirmed. 621 F. 2d 1340 (CA5 1980). As had the District Court, see n. 14, *supra*, the court concluded that the Eleventh Amendment did not prevent the court from resolving the controverted claims to ownership of the res, since resolution of that dispute was essential to a determination of whether the Eleventh Amendment in fact barred an exercise of jurisdiction by the federal court. 621 F. 2d, at 1345.[15] The court then held that the extraterritorial process issued pursuant to Supplemental Admiralty Rule C(5) was proper, *id.*, at 1346, and that the State did not have a valid claim to the property. *Id.*, at 1349.[16]

The Florida Department of State filed a petition for writ of certiorari, presenting only one question: "Whether the Eleventh Amendment to the United States Constitution bars an in rem admiralty action seeking to recover property owned by a state." Pet. for Cert. I. We granted the petition. 451 U. S. 982. We hold that the federal court had jurisdiction to secure possession of the property from the named state officials, since they had no colorable basis on which to retain possession of the artifacts. The court did not have power, however, to adjudicate the State's interest in the property without the State's consent.

---

Marshal, who has possession and control of such articles, shall deliver them to Treasure Salvors, Inc. and Armada Research Corp." App. 85.

Pursuant to this order, Treasure Salvors eventually received—under certain restrictions—the artifacts that the State held as custodian for the court. Record 554.

[15] The court noted that this result was particularly compelling in admiralty *in rem* actions. The court reasoned that, since federal courts have exclusive jurisdiction over such actions, if the mere assertion of ownership by a State were sufficient to invoke the Amendment, petitioners such as Treasure Salvors would be stranded without a forum in which to litigate their claim. 621 F. 2d, at 1346, n. 19.

[16] The court neither affirmed nor reversed the District Court's holding that Florida was in privity with the United States and therefore bound by the earlier decision of the Court of Appeals. *Id.*, at 1344, n. 17.

## II

Stripped of its procedural complexities and factual glamor, this case presents a narrow legal question. The District Court attempted to seize artifacts held by state officials and to bring the property within its admiralty *in rem* jurisdiction. Although the seizure in this case was extraterritorial, and thus involved an application of Supplemental Admiralty Rule C(5), the question presented for our decision would not be any different if the State merely resisted an attachment of property located within the district.

In response to the warrant of arrest, the State contended that it was immune from the federal process under the Eleventh Amendment.[17] It argued that the contracts executed with Treasure Salvors "alone determined the rights and obligations of the contracting parties . . . ." App. 44. The difficult question presented in this case is whether a federal court exercising admiralty *in rem* jurisdiction may seize property held by state officials under a claim that the property belongs to the State.[18]

---

[17] The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Although the Amendment does not literally apply to actions brought against a State by its own citizens, the Amendment long has been held to govern such actions. *Hans* v. *Louisiana*, 134 U. S. 1. See *Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279, 280; *Edelman* v. *Jordan*, 415 U. S. 651, 662. Nor does the Amendment literally apply to proceedings in admiralty. Again, however, the Court has found it to govern certain admiralty actions. See *In re New York*, 256 U. S. 490, 500.

[18] The fact that the State appeared and offered defenses on the merits does not foreclose consideration of the Eleventh Amendment issue; "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar" that it may be raised at any point of the proceedings. *Edelman* v. *Jordan*, *supra*, at 678; see *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459, 467 ("The Eleventh Amendment declares a policy

A suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity. *Alabama* v. *Pugh*, 438 U. S. 781. If the State is named directly in the complaint and has not consented to the suit, it must be dismissed from the action. *Id.*, at 782.[19] Of course, the fact that the State should have been dismissed from an action that has proceeded to judgment does not mean that the judgment may not stand against other parties who are not immune from suit.[20]

The Eleventh Amendment does not bar all claims against officers of the State, even when directed to actions taken in their official capacity and defended by the most senior legal officers in the executive branch of the state government. In *Ex parte Young*, 209 U. S. 123, the Court held that an action brought against a state official to enjoin the enforcement of an unconstitutional state statute is not a suit against a State barred by the Eleventh Amendment. In response to the argument that the official in such a case could act only as an officer of the State and that the suit therefore could be characterized only as an action against the State itself, the Court explained:

> "The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce

and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court").

[19] But see *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 ("Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts"); see also *Hutto* v. *Finney*, 437 U. S. 678; *Maher* v. *Gagne*, 448 U. S. 122.

[20] Thus, in *Alabama* v. *Pugh*, our holding that the State of Alabama and the Alabama Board of Corrections should have been dismissed as parties did not affect the substance of the relief granted against a number of Alabama officials responsible for the administration of its prison system.

an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce is a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.*, at 159–160.

There is a well-recognized irony in *Ex parte Young;* unconstitutional conduct by a state officer may be "state action" for purposes of the Fourteenth Amendment yet not attributable to the State for purposes of the Eleventh. Nevertheless, the rule of *Ex parte Young* is one of the cornerstones of the Court's Eleventh Amendment jurisprudence. See *Edelman* v. *Jordan*, 415 U. S. 651, 663–664; *Quern* v. *Jordan*, 440 U. S. 332, 337.

In *Tindal* v. *Wesley*, 167 U. S. 204, the Court applied the analysis later enshrined in *Ex parte Young* in a suit to recover property wrongfully held by state officials on behalf of the State of South Carolina. In *Tindal*, the plaintiff claimed title and a right of possession to certain real property held by a state official; the defendant answered that the property belonged to the State and asserted the Eleventh Amendment as a defense to the action. The Court described the issue presented for decision:

"So that the question is directly presented, whether an action brought against individuals to recover the possession of land of which they have actual possession and con-

trol, is to be deemed an action against the State within the meaning of the Constitution, simply because those individuals claim to be in rightful possession as officers or agents of the State, and assert title and right of possession in the State. Can the court, in such an action, decline to inquire whether the plaintiff is, in law, entitled to possession, and whether the individual defendants have any right, in law, to withhold possession? And if the court finds, upon due inquiry, that the plaintiff is entitled to possession, and that the assertion by the defendants of right of possession and title in the State is without legal foundation, may it not, as between the plaintiff and the defendants, adjudge that the plaintiff recover possession?" 167 U. S., at 212.

Relying extensively on the earlier decision in *United States v. Lee*, 106 U. S. 196,[21] the Court in *Tindal* held that the "settled doctrine of this court wholly precludes the idea that a suit against individuals to recover possession of real property is a suit against the State simply because the defendant holding possession happens to be an officer of the State and as-

---

[21] In *Lee*, the plaintiff brought an action in ejectment in federal court to recover the Virginia estate of General Robert E. Lee. The estate had been acquired by the United States for nonpayment of taxes, although the taxes in fact had been tendered by a third party. Once in possession, the Government had established a federal military installation and a national cemetery on the property. The plaintiff brought suit against the governmental custodians of the estate, who pleaded the sovereign immunity of the United States as a defense. This Court upheld a trial court judgment in favor of the plaintiff, on the ground that the defendants' possession of the estate was unlawful. The Court held that a suit against the federal officers under such circumstances was not a suit against the sovereign. Although *Lee* involved the sovereign immunity of the United States, the Court in *Tindal* stated that "it cannot be doubted that the question whether a particular suit is one against the State, within the meaning of the Constitution, must depend upon the same principles that determine whether a particular suit is one against the United States." 167 U. S., at 213.

serts that he is lawfully in possession on its behalf." 167 U. S., at 221. The Court refused to accept the proposition that the "doors of the courts of justice are . . . closed against one legally entitled to possession, by the mere assertion of the defendants that they are entitled to possession for the State." *Id.*, at 222. In explaining the extent of its decision, the Court stated:

> "[T]he Eleventh Amendment gives no immunity to officers or agents of a State in withholding the property of a citizen without the authority of law. And when such officers or agents assert that they are in rightful possession, they must make good that assertion when it is made to appear in a suit against them as individuals that the legal title and right of possession is in the plaintiff. If a suit against officers of a State to enjoin them from enforcing an unconstitutional statute, whereby the plaintiff's property will be injured . . . be not one against the State, it is impossible to see how a suit against the same individuals to recover the possession of property belonging to the plaintiff and illegally withheld by the defendants can be deemed a suit against the State." *Ibid.*[22]

In holding that the action was not barred by the Eleventh Amendment, the Court in *Tindal* emphasized that any judgment awarding possession to the plaintiff would not subse-

---

[22] The Court continued:

"Any other view leads to this result: That if a State, by its officers, acting under a void statute, should seize for public use the property of a citizen, without making or securing just compensation for him, and thus violate the constitutional provision declaring that no State shall deprive any person of property without due process of law, *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226, 236, 241, the citizen is remediless so long as the State, by its agents, chooses to hold his property; for, according to the contention of the defendants, if such agents are sued as individuals, wrongfully in possession, they can bring about the dismissal of the suit by simply informing the court of the official character in which they hold the property thus illegally appropriated." *Id.*, at 222.

quently bind the State. "It is a judgment to the effect only that, as between the plaintiff and the defendants, the former is entitled to possession of the property in question, the latter having shown no valid authority to withhold possession from the plaintiff," *id.*, at 223; "it will be open to the State to bring any action that may be appropriate to establish and protect whatever claim it has to the premises in dispute." *Ibid.*

The rule of law set forth in *United States* v. *Lee* and *Tindal* v. *Wesley* was clarified in *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682. In that case the plaintiff brought suit against a Government official to compel specific performance of a contract.[23] The plaintiff theorized that by withholding delivery of property as required by the contract the agent had exceeded his official authority and could be sued in federal court. The Court in *Larson* stated that "the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in a particular case, are constitutionally void." *Id.*, at 701–702. The Court held that the fact that an officer wrongfully withholds property belonging to another does not necessarily establish that he is acting beyond the permissible scope of his official capacity.[24] Since

---

[23] The plaintiff had contracted to purchase surplus coal from the War Assets Administration; the Administrator of that agency had withheld delivery and entered a new contract to sell the coal on the ground that the plaintiff had failed to perform a condition precedent to delivery. The plaintiff contended that title to the coal had passed at the time the contract was made, so that the Administrator was wrongfully withholding property that belonged to him.

[24] The Court stated:

"The mere allegation that the officer, acting officially, wrongfully holds property to which the plaintiff has title does not meet [the requirement that the action to be restrained or directed is not action of the sovereign]. True, it establishes a wrong to the plaintiff. But it does not establish that

in *Larson* it was not alleged that the Government official had exceeded his statutory authority—indeed, the plaintiff had affirmatively contended that the officer had authority to bind the Government on the contract at issue[25]—or that the exercise of such authority was unconstitutional,[26] the Court held that the action was barred by sovereign immunity.

These cases make clear that the Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory authority or, if within that authority, that such authority is unconstitutional. In such an action, however, the Amendment places a limit on the relief that may be obtained by the plaintiff. If the action is allowed to proceed against the officer only because he acted without proper authority, the judgment may not compel the State to use its funds to compensate the plaintiff for the injury. In *Edelman* v. *Jordan*, 415 U. S. 651, the Court made clear that "a suit by pri-

---

the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign. If he is exercising such powers, the action is the sovereign's and a suit to enjoin it may not be brought unless the sovereign has consented." 337 U. S., at 693.

The Court explicitly rejected the argument that "the commission of a tort cannot be authorized by the sovereign." *Ibid.;* see also *id.,* at 695.

[25] The Court found that the Administrator "was empowered by the sovereign to administer a general sales program encompassing the negotiation of contracts, the shipment of goods and the receipt of payment." *Id.,* at 692. "A normal concomitant of such powers, as a matter of general agency law, is the power to refuse delivery when, in the agent's view, delivery is not called for under a contract and the power to sell goods which the agent believes are still his principal's to sell." *Ibid.* The Court also noted that the "very basis of the respondent's action is that the Administrator was an officer of the Government, validly appointed to administer its sales program and therefore authorized to enter, through his subordinates, into a binding contract concerning the sale of the Government's coal." *Id.,* at 703.

[26] The Court held that there could be no claim that the Administrator's actions constituted an unconstitutional taking of property without compensation because the plaintiff had a remedy, in a suit for breach of contract, in the Court of Claims. *Id.,* at 703, n. 27.

vate parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Id.*, at 663. See *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459; *Quern* v. *Jordan*, 440 U. S., at 337.[27] In determining the relief that may be granted if a state officer is found to have acted without valid statutory authority, the question is whether the relief "constitute[s] permissible prospective relief or a 'retroactive award which requires the payment of funds from the state treasury.'" *Quern* v. *Jordan, supra*, at 346–347.

## III

In light of the principles set forth above, the proper resolution of the Eleventh Amendment issue raised in this case requires an answer to each of three specific questions: (a) Is this action asserted against officials of the State or is it an action brought directly against the State of Florida itself? (b) Does the challenged conduct of state officials constitute an ultra vires or unconstitutional withholding of property or merely a tortious interference with property rights? (c) Is the relief sought by Treasure Salvors permissible prospective relief or is it analogous to a retroactive award that requires "the payment of funds from the state treasury"?

---

[27] This principle is not absolute. As noted, n. 19, *supra*, Congress may authorize a suit against a State—pursuant to § 5 of the Fourteenth Amendment—that would entail the payment of public funds from the state treasury. *Fitzpatrick* v. *Bitzer*, 427 U. S. 445; *Hutto* v. *Finney*, 437 U. S. 678. Moreover, a prospective decree that has an "ancillary effect" on the state treasury "is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young.*" *Edelman* v. *Jordan*, 415 U. S., at 668; see also *Milliken* v. *Bradley*, 433 U. S. 267, 288. Finally, "[w]hile it is clear that the doctrine of *Ex parte Young* is of no aid to a plaintiff seeking damages from the public treasury . . . damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office." *Scheuer* v. *Rhodes*, 416 U. S. 232, 238.

## A

Treasure Salvors filed this admiralty *in rem* action in federal court, seeking a declaration of title to an abandoned sailing vessel that had been discovered on the ocean floor. The State of Florida was not named as a party and was not compelled to appear. Some of the property at issue, however, was held by officials of the Florida Division of Archives. Asserting that it was the rightful owner of the property, Treasure Salvors filed a motion "for an Order commanding the United States Marshal to arrest and take custody of those portions of the Plaintiffs' vessel now being held by L. Ross Morrell or James McBeth or being held under their custody, care or control." App. 11.[28] As requested, the District Court issued a warrant of arrest commanding the Marshal of the United States for the Southern District of Florida "to take into your possession the portions of said vessel which have been in the possession or are in the possession of L. Ross Morrell and/or James McBeth, or under their custody, care or control and to bring said portions of said vessel within the jurisdiction of this Honorable Court and transfer possession of same to the substitute custodian appointed in this action." *Id.*, at 41–42. It is this process from which the State contends it is immune under the Eleventh Amendment.[29]

It is clear that the process at issue was directed only at state officials and not at the State itself or any agency of the State.[30] Neither the fact that the State elected to defend on

---

[28] The motion identified L. Ross Morrell as the Director of the Division of Archives and James McBeth as the Bureau Chief of the Historical Museum of the Division of Archives. App. 15.

[29] As noted, the State immediately filed a motion to quash the warrant. *Id.*, at 43. Although that effort failed, the State asserted an Eleventh Amendment defense in its attempt to defeat a transfer of the property— and thus ultimate execution of the warrant—to Treasure Salvors. Record 422.

[30] As noted, n. 11, *supra*, Treasure Salvors filed a supplemental complaint seeking a declaratory judgment that its contracts with the State

behalf of its agents, nor the fact that the District Court purported to adjudicate the rights of the State, deprived the federal court of jurisdiction that had been properly invoked over other parties. See *Alabama* v. *Pugh*, 438 U. S. 781; n. 20, *supra*. The process thus is not barred by the Eleventh Amendment as a direct action against the State.

## B

The second question that must be considered is whether the state officials named in the warrant acted without legitimate authority in withholding the property at issue. In Treasure Salvors' first response to the State's Eleventh Amendment argument, it contended:

"If the Division of Archives were allowed to retain this property, its officials would be acting outside the scope of their authority under state law since the state statute under which they claim [does] not apply outside the states territory. The rationale of *Home Tel. & Tel. Co.* v. *Los Angeles*, [227 U. S. 278 (1913),] prohibits this result since to allow such action would be to deprive Treasure Salvors of their property without due process in viola-

---

were void. This action might be characterized as an action against the State itself. The District Court emphasized, however, that "the warrant was *not* issued in response to Treasure Salvors' Supplemental Complaint for Declaratory Judgment and Other Relief which was filed April 17, 1978." 459 F. Supp., at 526 (emphasis in original).

The order to show cause entered by the District Court was addressed directly to the State of Florida. See App. 63. That order was issued, however, only after the State itself had filed a motion to quash the warrant. *Id.*, at 43 ("COMES NOW, the State of Florida, by and through the undersigned counsel, and moves this Court to set aside and quash the warrant for arrest in rem issued against the State of Florida at the request of Plaintiffs herein . . ."). The order to show cause did not alter the fact that the process resisted by the State on Eleventh Amendment grounds was directed only at state officials.

tion of the Fourteenth Amendment to the Constitution of the United States." Record 472.

Thus from the outset, Treasure Salvors has asserted that state officials do not have valid statutory authority to hold the property at issue.

In *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, this Court held that the actions of a federal official in withholding the delivery of goods pursuant to his interpretation of a disputed provision of a contract constituted at most a tortious deprivation of property. The proper remedy for the plaintiff was not an action in district court to compel delivery, but a suit for breach of contract in the Court of Claims. Actions of the Government official pursuant to legitimate contractual authority were neither ultra vires nor unconstitutional.

From the outset of the proceedings at issue here, the State of Florida has advanced the contracts that it executed with Treasure Salvors as a defense to the federal court's attempt to secure possession of the artifacts held by the named state officials. It is noteworthy, however, that the State has never argued that the contracts conferred upon the State a right of ownership in the artifacts; the contracts simply "determined the rights and obligations of the contracting parties . . . ." App. 44. The State has argued that the contracts are valid and "in no way affected" by the decision of this Court in *United States* v. *Florida*, 420 U. S. 531. App. 44.[31]

We are not called upon in this case to determine "the rights and obligations" of two parties to a contract. The issue pre-

---

[31] In this Court the State has asserted that the issue on the merits involves a determination of the validity of the contracts. See *post*, at 712, n. 9. But the State has not identified any language in the contracts that provides even a colorable basis for a claim that the State has an ownership interest in the artifacts.

694

sented is whether state officials had authority to refuse to surrender possession of the artifacts to the District Court. The salvage contracts are not relevant to that question unless they provide a basis upon which the officials may claim a right to withhold possession of the property. Unless the contracts determine rights of the parties to the property, they are collateral to the issue before us.

It is apparent that the State does not have even a colorable claim to the artifacts pursuant to these contracts. The contracts did not purport to transfer ownership of any artifacts to the State; they permitted Treasure Salvors "to conduct underwater salvage from and upon certain submerged sovereignty lands of and belonging to the State of Florida," *id.*, at 20–21, "for the purpose of salvaging abandoned vessels or the remains thereof . . . *which abandoned material is the property of the State of Florida.*" *Id.*, at 22 (emphasis added). The contracts provided for the performance of services on property that was believed to belong *in toto* to the State of Florida, in exchange for which the State agreed to "award to the Salvager seventy-five percent (75%) of the total appraised value of all material recovered . . . ." *Id.*, at 33. The State did not "yield" its claim to 75% of the artifacts in order to receive an undisputed right to the remaining 25%; the State agreed to pay Treasure Salvors the equivalent of 75% of the proceeds in compensation for the difficult and expensive work undertaken by Treasure Salvors in retrieving from the floor of the ocean property that was believed to belong to the State.

The salvage contracts might well provide a basis for a claim to the property by Treasure Salvors; for the contracts did purport to transfer a portion of the artifacts *from* the State to Treasure Salvors in compensation for the latter's services. Treasure Salvors does claim a right to ownership, but based entirely on the fact that it was the finder of abandoned property and therefore entitled to the property independently of

the contracts.[32] Thus neither party's rights to ownership is affected in any way by the salvage contracts; whether the contracts are valid or not, they provide no authority for the refusal of state officials to surrender possession of the artifacts.

The authority of state officials to claim the artifacts was derived solely from Fla. Stat. § 267.061(1)(b) (1974), which provided:

> "It is further declared to be the public policy of the state that all treasure trove, artifacts and such objects having intrinsic or historical and archaeological value *which have been abandoned on state-owned lands or state-owned sovereignty submerged lands* shall belong to the state with the title thereto vested in the division of archives, history and records management of the department of state for the purpose of administration and protection." (Emphasis added.)

This Court has determined, however, that the *Atocha* was not found on "state-owned sovereignty submerged lands." Rather, it was discovered on the Outer Continental Shelf of the United States, beneath international waters.[33]

---

[32] This case is thus unlike *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, in which the plaintiff asserted a right to the property pursuant to the very contract that it contended the Government official had breached without authority. Treasure Salvors claims ownership of the res on the ground that the property was abandoned by the former owner, and discovered by Treasure Salvors, on the Continental Shelf of the United States in international waters. See n. 8, *supra*.

[33] In this Court the State has advanced the argument that its boundaries for purposes of rightful ownership of sunken ships extend further than its boundaries for purposes of ownership of mineral resources. This argument was not raised in the petition for certiorari, is foreclosed by our prior determination of the State's boundaries, see n. 5, *supra*, and is refuted by the State's own conduct in this case. The State has never attempted to claim ownership of the property that Treasure Salvors has continued to recover since the expiration of the contracts. Given the State's vigorous de-

No statutory provision has been advanced that even arguably would authorize officials of the Division of Archives to retain the property at issue. Throughout this litigation, the State has relied solely on the contracts that it executed with Treasure Salvors as a defense to the federal court's process; those contracts were predicated entirely on a state statute that on its face is inapplicable in this case.[34] Actions of state officials in holding property on the assumption that it was found on state land and *for that reason* belongs to the State—when it is undisputed that the property was *not* found on state land—is beyond the authority of any reasonable reading of any statute that has been cited to us by the State.[35]

As recognized in *Larson*, "action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the

---

fense of the relatively few artifacts at issue in this case, it is difficult to imagine that the State idly would permit Treasure Salvors to pirate other treasure that rightfully belonged to the State.

[34] The fact that the contracts were executed on the basis of a mistaken understanding concerning the ownership of the *Atocha* cannot, of course, provide Florida with a colorable claim of ownership. For if the mistake had not occurred, it would have been apparent from the outset that Treasure Salvors had no reason to enter into a contract with Florida or any other stranger to the transaction. The State of Florida has never contended that it would benefit from a reformation of the contracts; Treasure Salvors' position does not depend on any change in the terms of the contracts. The Eleventh Amendment analysis in this case does not require any consideration of the doctrine of mistake.

[35] Although the State in this case relies only on the disputed contracts—and not on any statutory provision—we note that Fla. Stat. § 267.061(2)(a) (1981) provides generally that it is the responsibility of the Division of Archives to "[l]ocate, acquire, protect, preserve, and promote the location, acquisition, and preservation of historic sites and properties, buildings, artifacts, treasure trove, and objects of antiquity which have scientific or historical value or are of interest to the public, including, but not limited to, monuments, memorials, fossil deposits, Indian habitations, ceremonial sites, abandoned settlements, caves, sunken or abandoned ships, or any part thereof." Surely this section does not authorize state officials, however, to seize and hold historical artifacts at will wherever they are found.

plaintiff's property)" that is beyond the officer's statutory authority is not action of the sovereign, 337 U. S., at 701; a suit for specific relief against the officer is not barred by the Eleventh Amendment. This conclusion follows inevitably from *Ex parte Young.* If conduct of a state officer taken pursuant to an unconstitutional state statute is deemed to be unauthorized and may be challenged in federal court, conduct undertaken without any authority whatever is also not entitled to Eleventh Amendment immunity.

If a statute of the State of Florida were to authorize state officials to hold artifacts in circumstances such as those presented in this case, a substantial constitutional question would be presented. In essence, the State would have authorized state officials to retain property regardless of the manner in which it was acquired, with no duty to provide compensation for a public taking. If the Constitution provided no protection against such unbridled authority, all property rights would exist only at the whim of the sovereign.

Thus, since the state officials do not have a colorable claim to possession of the artifacts, they may not invoke the Eleventh Amendment to block execution of the warrant of arrest. Of course, the warrant itself merely secures possession of the property; its execution does not finally adjudicate the State's right to the artifacts. See *Tindal* v. *Wesley,* 167 U. S., at 223. In ruling that the Eleventh Amendment does not bar execution of the warrant, we need not decide the extent to which a federal district court exercising admiralty *in rem* jurisdiction over property before the court may adjudicate the rights of claimants to that property as against sovereigns that did not appear and voluntarily assert any claim that they had to the res.

C

Finally, it is clear that the relief sought in this case is consistent with the principles of *Edelman* v. *Jordan,* 415 U. S.

651. The arrest warrant sought possession of specific property. It did not seek any attachment of state funds and would impose no burden on the state treasury.

This case is quite different from *In re New York (I)*, 256 U. S. 490, and *In re New York (II)*, 256 U. S. 503, relied on by the State. In *In re New York (I)*, the plaintiff brought an action in federal court to recover damages caused by canal boats chartered by the State of New York. Pursuant to admiralty practice, the action was brought *in rem* against the vessels themselves. The owner of the vessels answered the complaint, contending that the action should be directed against the Superintendent of Public Works of the State of New York. The District Court agreed and ordered the Superintendent to appear and answer; in the event that he could not be found the court directed that "the goods and chattels of the State of New York used and controlled by him" should be attached. 256 U. S., at 496.

The Attorney General of the State appeared on behalf of the Superintendent and asserted the Eleventh Amendment as a defense to the action. This Court held that the District Court lacked jurisdiction to proceed against the Superintendent. The Court noted that "the proceedings against which prohibition is here asked have no element of a proceeding *in rem*, and are in the nature of an action *in personam* against Mr. Walsh, not individually, but in his capacity as Superintendent of Public Works of the State of New York," *id.*, at 501; moreover, "[t]here is no suggestion that the Superintendent was or is acting under color of an unconstitutional law, or otherwise than in the due course of his duty under the constitution and laws of the State of New York." *Id.*, at 502. The Court concluded: "In the fullest sense, therefore, the proceedings are shown by the entire record to be in their nature and effect suits brought by individuals against the State of New York, and therefore—since no consent has been given—beyond the jurisdiction of the courts of the United States." *Ibid.*

In *In re New York (II)*, the plaintiff filed an action in admiralty to recover damages caused by the negligent operation of a canal boat *owned* by the State of New York. The action was brought *in rem* and the vessel was arrested. This Court held, as it had in *In re New York (I)*, that the federal court lacked jurisdiction to adjudicate the claim. In broad language urged upon us here, the Court stated that property owned by a State and employed solely for governmental uses was exempt from seizure by admiralty process *in rem*. 256 U. S., at 511. The force of the holding in *In re New York (II)*, however, is that an action—otherwise barred as an *in personam* action against the State—cannot be maintained through seizure of property owned by the State. Otherwise, the Eleventh Amendment could easily be circumvented; an action for damages could be brought simply by first attaching property that belonged to the State and then proceeding *in rem*.

In these cases the plaintiff did not claim an ownership interest in the vessels and did not question the State's assertion of ownership. The sole purpose of the attempted arrests was to enable the court to acquire jurisdiction over a damages claim that was otherwise barred by the Eleventh Amendment. In this case Treasure Salvors is not asserting a claim for damages against either the State of Florida or its officials. The present action is not an *in personam* action brought to recover damages from the State. The relief sought is not barred by the Eleventh Amendment.

## IV

The Eleventh Amendment thus did not bar the process issued by the District Court to secure possession of artifacts of the *Atocha* held by the named state officials. The proper resolution of this issue, however, does not require— or permit—a determination of the State's ownership of the artifacts.

This resolution of the immunity issue is not consistent with the disposition of the Court of Appeals. The court properly held that the Eleventh Amendment did not bar execution of the warrant of arrest; in making that determination, however, the Court of Appeals improperly adjudicated the State's right to the artifacts. While such an adjudication would be justified if the State voluntarily advanced a claim to the artifacts, it may not be justified as part of the Eleventh Amendment analysis, the only issue before us.

For these reasons, the judgment of the Court of Appeals must be affirmed in part and reversed in part. To the extent that the court held that the Eleventh Amendment did not prohibit an execution of the warrant and transfer of the artifacts to Treasure Salvors, its judgment is affirmed. To the extent that the court determined the State's ownership of the artifacts as part of its Eleventh Amendment analysis, its judgment is reversed.

*It is so ordered.*

JUSTICE BRENNAN, concurring in the judgment in part and dissenting in part.

I agree with the plurality that the Eleventh Amendment prohibited neither an execution of the warrant nor a transfer to respondents of the artifacts at issue in this case. See *ante*, at 699 and this page. My rationale for this conclusion differs from the plurality's, however. Both respondents are corporations organized under the laws of the State of Florida. Thus this suit is not "commenced or prosecuted against one of the United States by citizens of *another* State." U. S. Const., Amdt. 11 (emphasis added). The plurality asserts that this constitutional provision "long has been held to govern" "actions brought against a State by *its own* citizens." *Ante*, at 683, n. 17 (emphasis added), citing *Hans* v. *Louisiana*, 134 U. S. 1 (1890). I have long taken the view that *Hans* did *not* rely upon the Eleventh Amendment, and that that Amendment does *not* bar federal court suits against a

State when brought by its own citizens.   See *Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279, 309–322 (1973) (dissenting opinion); *Edelman* v. *Jordan*, 415 U. S. 651, 687 (1974) (dissenting opinion).   I adhere to this view, and I therefore believe that the Eleventh Amendment is wholly inapplicable in the present case.*   To this extent, I am in agreement with the plurality's disposition.

I disagree, however, with the plurality's conclusion that the courts below erred when they "determined the State's ownership of the artifacts as part of [their] Eleventh Amendment analysis."   *Ante*, at 700.   The record before us plainly indicates that the State had a full opportunity to present its arguments respecting ownership of the artifacts at issue in this case when the action was in the District Court, and that that court held a full evidentiary hearing on the merits of these arguments.   See *Treasure Salvors, Inc.* v. *Unidentified Wrecked and Abandoned Sailing Vessel*, 459 F. Supp. 507, 521 (SD Fla. 1978); 621 F. 2d 1340, 1344 (CA5 1980). The State's arguments were rejected in the District Court, and that rejection was affirmed by the Court of Appeals. The plurality today appears to agree with the courts below that the arguments available to the State on the merits were, and are, insubstantial.   *Ante*, at 694–697.   "No statutory provision has been advanced that *even arguably would authorize* officials of the Division of Archives to retain the property at issue," *ante*, at 696 (emphasis added), and "the State *does not have even a colorable claim to the artifacts*" pursuant to its contracts with respondents, *ante*, at 694 (emphasis added).   Given such legal conclusions, I fail to see any need to reverse the determination by the courts below of the State's ownership, as the plurality prescribes, *ante*, at 700.

---

*For this reason, I cannot agree with footnote 17 of the plurality's opinion.   To the extent, however, that the plurality concludes that the judgment of the Court of Appeals should be affirmed because the State of Florida does not have even a colorable claim to the artifacts, I agree with its opinion.

I do understand that the plurality does *not remand* this action for a determination of the State's ownership, and rather simply reverses the judgment below on this point. But the fact remains that the courts below have already determined the merits of the State's claim: Even if they were incorrect to make that determination at the time that they did, why should that fact *invalidate* that determination? Why should the State now get a second bite at the apple?

In sum, I would affirm the judgment of the Court of Appeals in its entirety.

JUSTICE WHITE, with whom JUSTICE POWELL, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, concurring in the judgment in part and dissenting in part.

The essence of this litigation is a dispute between the State of Florida and one of its citizens over ownership of treasure. The Eleventh Amendment precludes federal courts from entertaining such suits unless the State agrees to waive its Eleventh Amendment immunity. Because it is the State itself which purports to own the controverted treasure, and because the very nature of this suit, as defined in the complaint and recognized by both the District Court and Court of Appeals, is to determine the State's title to such property, this is not a case subject to the doctrine of *Ex parte Young*, 209 U. S. 123 (1908). In short, this is a suit against the State of Florida, without its permission. Moreover, were the suit to be characterized as one against only state agents, I would find that contract with the State provided a colorable basis upon which the agents could hold the property.

The Court of Appeals, like the District Court, thought that the jurisdictional issue raised by the State merged with a determination on the merits of the validity of the State's claim to the property. The appellate court believed that it had "jurisdiction to decide jurisdiction" and could therefore determine who owned the artifacts in order to ascertain whether the suit was, in fact, an action against the State.

By holding that "[t]he court did not have power . . . to adjudicate the State's interest in the property without the State's consent," *ante*, at 682, the Court properly rejects this novel conception of the Eleventh Amendment.* The appellate court's approach to the jurisdictional issue is not consistent with our prior cases; it incorrectly assumes that a federal court may adjudicate a State's right to ownership of specific property within the possession of state officials without the State's consent. The approach is unsatisfactory because, as Judge Rubin noted in dissent, it "is equivalent to asserting that suits against a state are permitted by the eleventh amendment if the result is that the state loses." 621 F. 2d 1340, 1351 (CA5 1980). Although disagreeing with the Court of Appeals' Eleventh Amendment holding, the plurality nevertheless proceeds to conclude that the "State does not have even a colorable claim to the artifacts pursuant to [its] contracts" with respondents, *ante*, at 694, and that the state officials "have [no] colorable claim to possession of the artifacts." *Ante*, at 697. This for all practical purposes adjudicates the State's title, thus repeating the Eleventh Amendment error of the Court of Appeals.

JUSTICE STEVENS' plurality opinion rests precariously on two transparent fictions. First, it indulges in the fantasy that the enforcement of process by arrest of the res is somehow divorced from the action to determine the State's claim to the res—a position contradicted by our own most apposite precedents, the two *In re New York* cases, 256 U. S. 490 (1921), and 256 U. S. 503 (1921). That dubious proposition is parlayed by a second fiction—that Florida's Eleventh Amendment freedom from suit is meaningfully safeguarded by not formally rejecting the State's claim to the artifacts

---

*I therefore concur in the judgment of the Court only insofar as it reverses the Court of Appeals' determination of the State's ownership of the artifacts. On this point, all Members of the Court, except JUSTICE BRENNAN, are in agreement.

although federal agents may seize the contested property and federal courts may adjudicate its title. Neither of these novel propositions follows from *Ex parte Young, supra.* The rule of *Ex parte Young* is premised on the axiom that state officials cannot evade responsibility when their conduct "comes into conflict with the superior authority of [the] Constitution." *Id.,* at 159. Today, the plurality dilutes the probative force behind that cornerstone decision by extrapolating it to allow federal courts to decide a property dispute between a State and one of its citizens, without the State's consent. For these reasons, as explained below, I dissent in part.

## I
### *The Suit Is Against the State*

The case is directly traceable to Treasure Salvors' filing of a motion in District Court for an order commanding the United States Marshal to arrest and take custody of the contested artifacts and to bring them within the jurisdiction of the court. Record 318. The roots of the case, however, rest in the earlier *in rem* action brought by Treasure Salvors to establish its title to the wreck and its bounty. The District Court held that possession and title rested with Treasure Salvors. *Treasure Salvors, Inc.* v. *Abandoned Sailing Vessel,* 408 F. Supp. 907, 911 (SD Fla. 1976). The Court of Appeals affirmed Treasure Salvors' ownership of all objects within the District Court's jurisdiction and to those objects outside its territory with respect to the United States. *Treasure Salvors, Inc.* v. *Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F. 2d 330 (CA5 1978) *(Treasure Salvors I).*

Treasure Salvors' subsequent request for an arrest warrant was predicated on this decision.[1] The warrant was to

---

[1] "[T]he plaintiffs . . . pursuant to the Final Judgment rendered by this Court February 19, 1976 and the Appellate Opinion rendered by the United States Court of Appeals for the Fifth Circuit No. 76–2151, March

issue because it had already been decided that Treasure Salvors had "sole title and right to possession of the Defendant vessel." App. 13. Notwithstanding the Court of Appeals' limitation of its opinion to artifacts within the District Court's jurisdiction and to rights in the treasure asserted by the United States, Treasure Salvors sought enforcement of the judgment against the State of Florida. It did so on grounds that this Court's decision in *United States* v. *Florida*, 420 U. S. 521 (1975), removed Florida's right to the artifacts, and that Florida was privy to and bound by *Treasure Salvors I*.

> "Inasmuch as the State of Florida [and its officers] were privy to this litigation, it is clear that [the district court] confirmed to the Plaintiffs' . . . title to and right to immediate and sole possession of the vessel . . . together with all her . . . cargo, wherever the same may be found." App. 18 (emphasis deleted).

In short, Treasure Salvors requested seizure of the artifacts in order to enforce an earlier judgment against the State. This is reason enough to conclude that the suit, and the accompanying warrant for arrest of the articles, were actions invoking federal judicial power against the State and not merely its agents.

But even if this were not so, subsequent events reveal that the case is one against the State. After the State filed a motion to quash the warrant, Treasure Salvors filed a supplemental complaint requesting that the contract be held void; it also requested that the District Court rule "[t]hat the State has no right, title or interest" in any portions of the *Atocha* in its possession. Record 371. The District Court then entered an order to show cause addressed directly to the State

---

13, 1978, move this Court for an Order commanding the United States Marshal to arrest and take custody of those portions of the Plaintiff's vessel now being held by L. Ross Morrell or James McBeth or being held under their custody, care or control." App. 11.

of Florida. App. 63. The State then argued that the Eleventh Amendment barred the suit. After rejecting all of the State's arguments, the District Court ordered that Treasure Salvors "have full right and title to articles arrested and that they are entitled to possession." *Id.*, at 85. The Court of Appeals affirmed this judgment.

I find the inescapable conclusion to be that this suit, as filed, litigated, and decided, was an action to determine the title of the State of Florida to the artifacts.[2] A suit of this type is at the heart of the Eleventh Amendment immunity.

The line of cases culminating in *Ex parte Young*, 209 U. S. 123 (1908), are not to the contrary. In both *United States* v. *Lee*, 106 U. S. 196 (1882), and *Tindal* v. *Wesley*, 167 U. S. 204 (1897), the suits were against individual agents and did not purport to conclude the rights of the Government. As the Court correctly notes, *Tindal* made plain that a judgment awarding possession to the plaintiff would not subsequently bind the Government. Here the entire point of the *in rem* proceeding is to apply the judgment in *Treasure Salvors I* to erase the State's claim to the treasure. This is the only basis for issuance of the arrest warrant; it was the relief expressly requested by the respondents, and the relief subsequently granted by the District Court and the Court of Appeals.

My position is supported by the precedents closest to the instant case: the *In re New York* cases, 256 U. S. 490 (1921), and 256 U. S. 503 (1921). The first *In re New York* decision arose from an *in rem* libel against the private owners of tugboats that had been at fault in collisions while chartered and operated by the State. The owners sought to bring in the Superintendent of Public Works who had entered into the

---

[2] The fact that the District Court did not issue its arrest warrant in response to Treasure Salvors' amended complaint is of little significance. It is the complaint which defines the nature of an action, and once accepted, an amended complaint replaces the original. Moreover, the adjudication of title either reflects that the ownership claim followed from the original complaint or constituted action upon the amended complaint.

charters on the State's behalf. The issue before this Court was whether the State could, without its consent, be impleaded in admiralty process in an action against private parties. The Court held that the "proceedings against which prohibition is here asked," *i. e.*, the attempt to implead the State, "have no element of a proceeding *in rem* and are in the nature of an action *in personam*" against a state officer. The purpose of this distinction was not to suggest that *in rem* actions could be brought against the State, or even that the original libel was not a true *in rem* cause, but rather to highlight that impleading of a state official, no less than a direct action against the official, constituted a suit against a state officer in his "official capacity" and might require satisfaction out of the property of New York. 256 U. S., at 501.

The second *In re New York* decision, a sovereign immunity case, made clear that a State's immunity extended to admiralty actions *in rem*.

> "The principle so uniformly held to exempt the property of municipal corporations employed for public and governmental purposes from seizure by admiralty process *in rem*, applies with even greater force to exempt public property of a State used and employed for public and governmental purposes." 256 U. S., at 511.

The plurality's reading of *In re New York (II)* is that an action "otherwise barred as an *in personam* action against the State—cannot be maintained through seizure of property owned by the State." *Ante*, at 699.[3] Nothing in the language of Justice Pitney's opinion supports this interpretation. Moreover, the libel brought before the Court in that case was a true *in rem* action; an action in admiralty to recover damages caused by a ship is a classic *in rem* action, al-

---

[3] The plurality confuses the matter further by treating the cases as bearing on the question of whether a burden is imposed on the state treasury. The *In re New York* cases pertain instead to the initial issue of whether the action is against the State.

though after the owners of the vessel are identified the libel often will be amended to include an *in personam* claim as well.  G. Gilmore & C. Black, Law of Admiralty 498 (2d ed. 1975) (Gilmore & Black).  Therefore, *In re New York (II)* is as "true" an *in rem* action as the instant case.

The grounds of similarity between the cases are clear: in both cases *in rem* libels were filed and process by arrest was requested; in both suits the State by its Attorney General responded and indicated to the District Court that the property to be arrested was in the possession and ownership of the State, and therefore immune from seizure and attachment. In both cases, the District Court overruled the suggestion and awarded process *in rem*, authorizing the arrest of the res.  When the seizure of the *Queen City* finally reached this forum, the Court stated that the property was exempt from seizure by admiralty process *in rem*.[4]  The plurality's distinction aside, the cases can be distinguished on but a single relevant point: the fact that ownership of the res is contested here.  That, of course, is the grounds on which the Court of

---

[4] *In re New York (II)* was decided on straight sovereign immunity grounds: "[T]he record—aside from whether a suit in admiralty brought by private parties through process *in rem* against property owned by a State is not in effect a suit against the State, barred by the general principle applied in *Ex parte New York, No. 1*, No. 25, Original—presents the question whether the proceeding can be based upon the seizure of property owned by a State and used and employed solely for its governmental uses and purposes."  The Court went on to decide the vessel was immune from admiralty process, based upon "the law of nations" and "general grounds of comity and policy."  256 U. S., at 510.

*In re New York (II)*'s resolution on sovereign immunity grounds has several implications.  First, as with other sovereign immunity decisions, it is direct support for determining what constitutes a suit against the State. *Ante*, at 686, n. 21.  Cf. *Tindal* v. *Wesley*, 167 U. S. 204, 213 (1897).  Second, it undercuts the plurality's analysis that the case merely stops roundabout circumvention of *In re New York (I)* through "first attaching property that belonged to the State and then proceeding *in rem*."  *Ante*, at 699.  As the above quoted passage indicates, the *In re New York (II)* Court did not need to go so far in order to find the suit barred.

Appeals decided the case—a resolution which the plurality apparently rejects.

*In re New York (I)* indicates that the Eleventh Amendment will bar a suit that has the effect of proceeding against a state officer and involving the State's property. *In re New York (II)* squarely stands for the proposition that sovereign immunity bars process against a res in the hands of state officers. This is true even though an *in rem* action strictly proceeds against the vessel, and the owner of the vessel or artifacts is not an indispensable party. Significantly, *In re New York (II)* did not distinguish between the service of process to arrest the res and the thrust of the libel itself to determine the rights in the vessel. I follow that course in this case, and refuse to sever the attempt to arrest the artifacts from the attempt to decide their ownership.

The *In re New York* cases are particularly forceful because they reflect the special concern in admiralty that maritime property of the sovereign is not to be seized. This principle dates back to the English[5] and has not been significantly al-

---

[5] Under English law, no warrant for arrest will issue against any vessel in the actual service of a recognized foreign government. Significantly, this is so even if the suit itself is not barred. See, *e. g.*, *The Messicano*, 32 T. L. R. 519 (1916). Where plaintiff sues *in rem* for possession "the writ will be dismissed, if a foreign recognized government claims the right to possession and is in the actual possession of the vessel, regardless of whether possession was rightfully or wrongfully obtained." Riesenfeld, Sovereign Immunity of Foreign Vessels in Anglo-American Law: The Evolution of a Legal Doctrine, 25 Minn. L. Rev. 1, 25 (1940). In *The Parlement Belge*, 5 P. D. 197, 220 (1880), the "leading authority" in England, it was held that "[i]f the remedy sought by an action in rem against public property is, as we think it is, an indirect mode of exercising the authority of the Court against the owner of the property, then the attempt to exercise such an authority is an attempt inconsistent with the independence and equality of the state which is represented by such owner." Moreover, after a ship was declared by the foreign sovereign "to be in his possession as sovereign and to be a public vessel of the state," it was "very difficult to say that any Court can inquire by contentious testimony whether that declaration is or is not correct." *Id.*, at 219.

tered in this country.[6]  The *In re New York* cases are but the most apposite examples of the line of cases concerning *in rem* actions brought against vessels in which an official of the State, the Federal Government, or a foreign government has asserted ownership of the res.  The Court's consistent interpretation of the respective but related immunity doctrines pertaining to such vessels has been, upon proper presentation that the sovereign entity claims ownership of a res in its possession, to dismiss the suit or modify the judgment accordingly.[7]

Finally, the allowance of an *in rem* suit against arguably state-owned maritime property rests on the "personification" theory of the res—that the action runs against the *Atocha* and not the State of Florida.  This distinction between *in rem* and *in personam* actions has been decisively rejected. As the fiction of the personality of the ship declined, Gilmore & Black 615, 804–805, *in rem* actions were given *in personam* effect, and *in personam* judgments barred subsequent *in rem* actions.  *Id.*, at 802, 613–614.  See, *e. g.*, *Burns Bros.* v. *Central R. Co. of New Jersey*, 202 F. 2d 910 (CA2 1953) (L. Hand, J.).  In short, under long-established admiralty law,

---

[6] For early cases, see *United States* v. *Peters*, 3 Dall. 121 (1795); *The Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812); *L'Invincible*, 1 Wheat. 238 (1816); *The Santissima Trinidad*, 7 Wheat. 283 (1822).  In *The Siren*, 7 Wall. 152 (1869), the Court allowed a claim against the proceeds of the vessel when sold, but stressed that no claim could be enforced while the Government owned the vessel.  In *The Western Maid*, 257 U. S. 419 (1922), the Court, per Justice Holmes, went further and refused to allow a claim against a Government-owned vessel as enforceable either during Government ownership or thereafter.  Shortly thereafter, sovereign immunity was expanded to embrace ships engaged solely in commerce. *Berizzi Bros. Co.* v. *S.S. Pesaro*, 271 U. S. 562 (1926).

[7] See Gilmore & Black 606–613.  Only when a vessel is not in the sovereign's possession, is there controversy over the proper means by which the foreign government may assert its ownership.  See *Compania Espanola de Navegacion Maritima* v. *The Navemar*, 303 U. S. 68 (1938).

arrest of sovereign maritime property is not tolerated, and an *in rem* suit directed at government property is an action against the State.

## II
### *Holding of the Treasure by State Officials Was Not Ultra Vires*

Alternatively, if the arrest of the artifacts was not, without more, a suit against the State, the action was nevertheless against state agents acting within their authority and holding property for the State under a colorable claim of right. It is settled that the Eleventh Amendment bars actions which are in effect against the State, even though the State is not the nominal party. *Louisiana* v. *Jumel,* 107 U. S. 711, 719–723, 727–728 (1883).

Leaving aside other possible bases by which the state officials had authority to refuse to surrender possession of the artifacts, I address the salvage contracts entered into between the State and Treasure Salvors. Under the contracts, which were renewed annually, Treasure Salvors was to conduct underwater salvage on Florida lands. By the terms of the contract, Treasure Salvors received 75% of the artifacts recovered. The State was to retain 25% of the representative artifacts. This arrangement was renewed on three occasions, the last contract being entered into on December 3, 1974. It was during that contract's duration that we decided *United States* v. *Florida,* 420 U. S. 531 (1975), which established Florida's boundaries along lines which placed the *Atocha* in international waters.

If it were not for this decision, it would be beyond cavil that Florida owned one-fourth of the artifacts pursuant to its ownership of the submerged land on which the *Atocha* rested as well as the contracts. It is also beyond reasonable dispute that the Eleventh Amendment bars a federal court from deciding the rights and obligations of a State in a contract unless the State consents. *Larson* v. *Domestic & Foreign*

*Commerce Corp.*, 337 U. S. 682 (1949). The plurality does not take issue with this proposition.[8]

The plurality treats this as a different case for two reasons. The first is that the State has never, in so many words, argued that the contracts conferred upon the State a right of ownership in the artifacts. *Ante,* at 693. While this may be true in the sense that Florida believed that it owned the artifacts even aside from the contracts, it is not true that Florida has not asserted that the contracts create an independent right to the treasure. Florida has repeatedly and expressly made precisely such a claim.[9]

The plurality's second argument is that the "State does not have even a colorable claim to the artifacts pursuant to these contracts." *Ante,* at 694. I disagree with this conclusion. The wording of the contract is reasonably interpretable as providing for a division of the recovered treasure. The intention of the parties upon the making of the contract, of course, governs the interpretation of the instrument. If *United States* v. *Florida, supra,* had placed the *Atocha* within Florida waters, it could not reasonably be argued that the contract did not constitute a valid basis for the State's

---

[8] "In *Larson* . . . this Court held that the actions of a federal official in withholding the delivery of goods pursuant to his interpretation of a disputed provision of a contract constituted at most a tortious deprivation of property. . . . Actions of the Government official pursuant to legitimate contractual authority were neither ultra vires nor unconstitutional." *Ante,* at 693.

[9] "At issue in the present case is both a contract and property right of the State of Florida to the artifacts previously in its possession . . . ." Brief for Petitioner 32; "The issue on the merits was whether the State had property rights to artifacts in its Archives—that is, whether the contract to which the state was a party was valid." *Id.,* at 60. "The State of Florida has not claimed a lien on the artifacts; it has claimed ownership—through fully executed contracts." Reply Brief for Petitioner 16–17. "The contract alone determined the rights and obligations of the contracting parties and was in no way affected by United States v. Florida." State's Motion to Quash Warrant for Arrest in Rem, App. 44.

claim to 25% of the artifacts. Both Treasure Salvors and the State entered into the contracts on the assumption that the *Atocha* rested in Florida waters. As it happened, the *Florida* decision upset that mutual assumption. This does not, however, inexorably mean that the contracts are so invalid as to render possession of the artifacts ultra vires.[10] Admiralty law may provide that such a mistake is not grounds for rescission of fully performed contracts in these circumstances.[11] The plurality's contention that the language of the contracts does not purport to transfer artifacts from Treasure Salvors to the State utterly ignores the concept of mistake. The notion of mistake would be read out of contract law if courts expected a contract, written under mistaken assumptions, to read as if the mistake had not occurred.

Whether the contracts are ultimately valid is beside the point. The existence of a colorable contractual claim to the artifacts, the presence of statutory authority for the State to enter into the contracts, and the ability to raise a mistake-of-law defense not rejectible on its face, is all that need be shown to indicate that possession of the artifacts by the state officials was not ultra vires. Although it would be too much

---

[10] The plurality also suggests that the contracts "were predicated entirely on a state statute that on its face is inapplicable in this case." *Ante*, at 696. This no more than restates the plurality's characterization of the contracts. But it does highlight that the contracts' validity is called into question only by a mistaken assumption of law—the statute's "inapplica[bility]" after *United States* v. *Florida*, 420 U. S. 531 (1975).

[11] The inherent uncertainty in contracts for salvage has led admiralty courts to find few reasons that would justify reformation of a contract. See *The Elfrida*, 172 U. S. 186, 196 (1898) ("We do not think that a salvage contract should be sustained as an exception to the general rule, but rather that it should, *prima facie*, be enforced, and that it belongs to the defendant to establish the exception"). Gilmore & Black 582 ("Whether the gamble turns well or badly for the salvor, the 'no cure no pay' contract is everywhere recognized as enforceable, absent such invalidating causes as fraud and duress").

to suggest that our Eleventh Amendment is crystal clear in all respects, this is, at least, the teaching of our most recent cases.

*Larson* v. *Domestic & Foreign Commerce Corp., supra,* is most directly apposite. There a private corporation brought suit in Federal District Court against the Administrator of the War Assets Administration, an agency of the United States Government, in his official capacity. The claim was that the Administration had sold certain surplus coal to the plaintiff, but had refused to deliver it and had made a new contract to sell it to others. A declaration was sought that the first contract was valid, the second contract invalid, and appropriate injunctive relief was requested. The Court held that the suit was against the United States and the District Court was therefore without jurisdiction to entertain it. The Court's decision rested on the Administrator's statutory authority to enter a binding contract to sell coal, and the absence of a claim that the failure to deliver the coal constituted a taking of private property. The Court refused to pass upon the validity of the contract itself, *i. e.,* whether the initial contract with the plaintiff was breached.[12]

*Larson* established that where the officer's actions are limited by statute, actions beyond those limitations are to be considered individual and not sovereign actions. "The officer is not doing the business which the sovereign has empowered him to do . . . . His actions are *ultra vires* his authority

---

[12] The plurality's attempt to distinguish *Larson* is puzzling. It notes that while the plaintiff in *Larson* asserted a right to the property pursuant to the very contract it contended the Government official had breached, here Treasure Salvors claims ownership on grounds entirely independent of the contracts. This is a distinction without meaning: it is the State's claim to the property which is significant; the basis for Treasure Salvors' claim is quite beside the point. The relevant comparison is that the federal official in *Larson* was arguably without authority to enter a contract to sell coal that he had already sold just as the State was arguably without authority to enter a contract respecting salvage on lands outside its waters.

and therefore may be made the object of specific relief." 337 U. S., at 689. Similarly, unconstitutional actions by state officers could not be considered the work of the sovereign and were not protected by the shield of sovereign immunity. The *Larson* Court rejected, however, a third proposed category of official actions amenable to suit.[13] It was urged upon the Court that if an "officer . . . wrongly takes or holds spe-

---

[13] The plurality acknowledges that *Larson* clarified the understanding of earlier cases such as *Tindal* v. *Wesley*, 167 U. S. 204 (1897), and *United States* v. *Lee*, 106 U. S. 196 (1882). Dicta in both *Tindal* and *Lee* are cited by the Court to suggest that a federal court may adjudicate the validity of a title in order to determine whether the case is a suit against the State. It is precisely this aspect of the cases that *Larson* "clarified." A court may go only so far as to ascertain whether an official has a colorable basis for his action—to go farther is to, in effect, try the case on the jurisdictional issue and "is equivalent to asserting that suits against the state are permitted by the eleventh amendment if the result is that the state loses." 621 F. 2d 1340, 1351 (CA5 1980) (Rubin, J., dissenting).

The inapplicability of *United States* v. *Lee* was made clear in *Malone* v. *Bowdoin*, 369 U. S. 643 (1962), a case involving an attempt to eject a Forest Service Officer from land occupied by him solely in his official capacity under a claim of title in the United States. The plaintiffs argued they were the rightful owners of the land. The Court held that the suit was an impermissible action against the United States, and stated:

"While not expressly overruling *United States* v. *Lee, supra*, the Court in *Larson* limited that decision in such a way as to make it inapplicable to the case before us. Pointing out that at the time of the *Lee* decision there was no remedy by which the plaintiff could have recovered compensation for the taking of his land, the Court interpreted *Lee* as simply 'a specific application of the constitutional exception to the doctrine of sovereign immunity.' 337 U. S. at 696. So construed, the *Lee* case has continuing validity only 'where there is a claim that the holding constitutes an unconstitutional taking of property without just compensation.' *Id.*, at 697." *Id.*, at 647–648.

An *in rem* admiralty action, like an ejectment suit, is an action to determine title to property, and, here, like in *Bowdoin*, there is no claim of an unconstitutional taking without adequate compensation. Indeed, Treasure Salvors may be able to bring an *in personam* action in state court to determine ownership of the treasure.

cific property to which the plaintiff has title," then his action is illegal and the officer may be sued. The Court found the theory erroneous:

> "The mere allegation that the officer, acting officially, wrongfully holds property to which the plaintiff has title does not meet that requirement. True, it establishes a wrong to the plaintiff. But it does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign." *Id.*, at 693.

This is a *Larson* case. Florida entered into the contract pursuant to an indisputably valid state statute, Fla. Stat. § 267.061(1)(b) (1974), providing title to treasure trove abandoned on state-owned submerged lands. The Court relies heavily, as it must, on the subsequent determination that the wreck of the *Atocha* was in international waters. This, of course, was not settled law at the time the contracts were entered into and executed. Before concluding that the state officials' exercise of rights under the contracts was ultra vires, it is necessary to reach the merits of the contract, and dispose of the mistake-of-law contention. Similarly, the scattershot reasoning of the District Court in refusing to honor the contract—characterization of the mistake as one of fact, treatment of the contract as void for coercion and lack of consideration—constitutes an adjudication of the merits of the contracts. *At the time the contracts were entered into and executed* they were not ultra vires or otherwise so plainly invalid as not to offer a colorable basis for possession of the artifacts.

It is significant that the analysis pursued by the plurality in this respect is little different from that of the Fifth Circuit in deciding the merits in order to ascertain jurisdiction over the matter. As indicated earlier, the plurality performs the task under a different rubric, but the result is equally objectionable. A colorable basis for the exercise of authority by state officials may not ultimately be a valid one, but it does serve to invoke the Eleventh Amendment. That is the lesson of *Larson* and we should adhere to it.

## III

The plurality begins by stating that "[s]tripped of its procedural complexities and factual glamor, this case presents a narrow legal question." *Ante*, at 683. Be that as it may, the answer supplied by the plurality is anything but narrow. If the plurality means all that it says today, the consequences will be unfortunate. Given that all property of the State must be held by its officers, and assuming a jurisdictional basis, there is no item within state possession whose ownership cannot be made the subject of federal litigation by the expedient of arrest or attachment. The State must then defend on the merits: it must persuade a federal court that its officers were justified in holding the controverted property. We see today that this inquiry will be tantamount to deciding the question of title itself. Moreover, the State's immunity from suit is stripped away on land as well as sea: the plurality notes that the question presented would not be any different if the State merely resisted an attachment of property. *Ibid.*

The plurality hardly conceals its view of Florida's claim to the artifacts or the equities involved in this litigation. Yet the Eleventh Amendment teaches that a federal court has no right to offer its opinion on a local dispute between a State and its citizens unless the State consents. In sum, the disposition of this case can only be explained by "procedural complexities and factual glamor." If so, the decision has earned a fitting sobriquet: aberration.