CARDAMONE, Circuit Judge.
The Superintendent of Banks of the State of New York (Superintendent or appellant) has seized $100 million in assets and other property from two failed foreign banks. The foreign bankruptcy administrator of the two banks — a governmental agency of the former State Union of Serbia and Montenegro known as the Deposit Insurance Agency (Agency) — seeks to recover the property, and to that end filed a bankruptcy petition in federal bankruptcy court pursuant to § 304 of the Bankruptcy Code (Code), 11 U.S.C. § 304.[1]
The Superintendent opposed the Agency’s petition before the United States District Court for the Southern District of New York (Rakoff, J.), asserting that she was immune from suit as an arm of a state sovereign under the Eleventh Amendment to the federal Constitution. The district court rejected this defense in a memorandum order dated August 13, 2004, and remanded the case for further bankruptcy proceedings. From that order the Superintendent appeals. Our jurisdiction rests on the rule of Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993), which permits state entities immediately to appeal a' district court’s denial of a motion to dismiss based on a claim of Eleventh Amendment immunity.
BACKGROUND
The relevant facts of this case are straightforward and not in dispute.
Jugobanka and Beogradska Banka (collectively Banks or foreign banks) are two banks of the former Yugoslavia. In the 1980s, the Banks received a license from New York banking authorities to operate, through a domestic branch, a banking business in New York. As foreign banks operating a business in New York, they became subject to the state’s banking regulations, including its insolvency regime. Thus in 1991 when civil and ethnic unrest broke out in Yugoslavia, the Superintendent demanded that the Banks increase their available assets in New York to ensure coverage of any domestic liabilities, in case the Banks should fail as a result of their home country’s deteriorating political condition.
In 1992 President George H.W. Bush issued Executive orders freezing the assets of firms organized or located in Yugoslavia. Acting on those orders, the U.S. Treasury Department closed the foreign banks’ offices and arranged to have their liquid assets frozen in several private New York banks, while the Banks’ other property, including their books and records, were stored in warehouses in New York. This property remained undisturbed for a decade.
In 2002 the government of the former Yugoslavia brought insolvency proceedings against the Banks and appointed the *616 Agency as the bankruptcy administrator. The Superintendent responded by commencing parallel state insolvency proceedings and ordering the seizure and delivery of all the foreign banks’ property located in New York. Although the Superintendent has not provided details, at least $100 million of the Banks’ cash was seized. These funds have been frozen since 1992 by Executive order and controlled by the U.S. Treasury Department’s Office of Foreign Assets Control. Permission for the seizure was obtained from the Treasury Department. According to appellant, these events operated to vest title to the property immediately in the Superintendent. See N.Y. Banking Law § 606(4)(a).
In June 2002 the Agency filed in the United States Bankruptcy Court for the Southern District of New York (Black-shear, J.) petitions to recover the Banks’ assets under § 304 of the Bankruptcy Code, 11 U.S.C. § 304. That section permits a “case ancillary to a foreign proceeding [to be] commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.” Id. We have said that the purpose of § 304 is to allow foreign bankruptcy administrators “to prevent the piecemeal distribution of assets in the United States by means of legal proceedings initiated in domestic courts by local creditors.” In re Koreag, Controle et Revision S.A., 961 F.2d 341, 348 (2d Cir.1992). By filing the § 304 petitions, the Agency sought to prevent the Superintendent, in her capacity as liquidator of the failed Banks’ New York branches, from giving special preferences to New York creditors.
On August 18, 2003 the bankruptcy court dismissed the Agency’s § 304 petitions. Agreeing with counsel for the Superintendent, the court found that § 109 of the Code, 11 U.S.C. § 109, evinced Congress’s plan to “limit [the bankruptcy court’s] jurisdiction over foreign banks where some alternate regulatory scheme exists for the liquidation of a foreign bank’s assets.” That section excludes foreign banks “engaged in ... business in the United States” from its definition of a debtor under chapter 7 of the Code. 11 U.S.C. § 109(b)(3)(B). The court refused to “exercise its jurisdiction over the [B]anks simply because the debtors filed petitions pursuant to 11 U.S.C. § 304, and not pursuant to chapter 7 or chapter 11.”
The Agency appealed the bankruptcy court’s decision to the district court. The district court, disagreeing with the bankruptcy court’s reading of the relevant provisions, vacated and remanded. It found § 109 “completely irrelevant” to the interpretation of § 304, observing that “ § 304 requires only that a petitioner be an authorized ‘foreign representative’ filing pursuant to a proper ‘foreign proceeding,’ which undisputably is the case here.”
Counsel for the Superintendent urged the district court to reconsider its decision, asking the court to address specifically the contention that the bankruptcy court lacked jurisdiction over the Superintendent because, as an arm of the State of New York, she is immune from federal jurisdiction under the Eleventh Amendment. The district court rejected this argument in an order dated August 13, 2004, on the ground that jurisdiction may be had notwithstanding the Eleventh Amendment pursuant to the judge-made doctrine of Ex parte Young. Moreover, the district court denied the Superintendent’s request that the statutory issue concerning §§ 304 and 109 be certified for immediate appeal to this Court rather than await review upon final judgment. See 28 U.S.C. § 1292(b).
The Superintendent then appealed to this Court the district court’s denial of her claim of Eleventh Amendment immunity under the collateral order doctrine, which permits immediate appellate review *617 of a “small class [of orders] which finally determine claims of right separable from, and collateral to¡ rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.” Puerto Rico Aqueduct, 506 U.S. at 143, 118 S.Ct. 684 (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).
After this appeal had been briefed and submitted, in January 2006 the Supreme Court handed down Central Virginia Community College v. Katz, 546 U.S. 356, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006), concerning the reach of the Eleventh Amendment in bankruptcy proceedings. Because of its potential pertinence to our pending decision, we requested counsel to submit additional briefing addressing the effect of the Supreme Court’s ruling on this appeal. Having considered now the parties’ papers, including the various ami-cus and supplemental briefs, we affirm the district court.
DISCUSSION
I State Sovereign Immunity
The Eleventh Amendment prohibits the “Judicial power of the United States” from extending to “any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.” U.S. Const. Amend. XI. This jurisdictional bar also immunizes a state entity that is an “arm of the State,” see Northern Ins. Co. of N.Y. v. Chatham County, Ga., 547 U.S. 189, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006), including, in appropriate circumstances, a state official acting in his or her official capacity, see Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). For purposes of this appeal, we assume, and no party disputes, that the Agency is a citizen or subject of a foreign state and that the Superintendent is an arm of the State of New York and thus entitled to whatever immunity the Eleventh Amendment may bestow.
State sovereign immunity is not absolute. Congress by statute may abrogate state immunity and subject the states to suit, provided that, first, its intention to do so is “unequivocally expressed” in the statutory language and, second, the legislation is enacted “pursuant to a valid grant of constitutional authority.” Tennessee v. Lane, 541 U.S. 509, 517, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). A state also may waive its Eleventh Amendment immunity — for example, by voluntarily invoking federal jurisdiction, as when the state itself brings a federal suit or removes a case from state to federal court. See Lapides v. Bd. of Regents, 535 U.S. 613, 618-20, 624, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); In re Charter Oak Assocs., 361 F.3d 760, 767-70 (2d Cir.2004). Moreover, under the venerable doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may sue a state official acting in his official capacity — notwithstanding the Eleventh Amendment — for “prospective injunctive relief’ from violations of federal law. See Edelman, 415 U.S. at 677, 94 S.Ct. 1347; Henrietta D. v. Bloomberg, 331 F.3d 261, 287-88 (2d Cir.2003).
The Supreme Court has considered the scope of state sovereign immunity in bankruptcy proceedings in two recent cases, Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004), and Central Virginia Community College v. Katz, 546 U.S. 356, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006). In Katz, the Supreme Court held that sovereign immunity does not prevent a bank *618 ruptcy trustee from setting aside preferential transfers by the debtor to state agencies. Katz, 126 S.Ct. at 994. We do not reach the question of whether Katz provides an alternate basis for our holding today because we think this case squarely resolved by the well-established doctrine set out in Ex parte Young.
II Ex Parte Young
We assume, without deciding, that the Eleventh Amendment bars this suit. Despite that bar, however, relief is available under the doctrine of Ex parte Young. See Verizon Md., Inc. v. Pub. Serv. Comm’n of Md., 585 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002); id. at 649, 122 S.Ct. 1753 (Souter, J., concurring) (concurring because the Court’s opinion rests on the ground that, “on the assumption of an Eleventh Amendment bar, relief is available under the doctrine of Ex parte Young”); Puerto Rico Aqueduct, 506 U.S. at 146, 113 S.Ct. 684 (“Rather than defining the nature of Eleventh Amendment immunity, Young and its progeny render the Amendment wholly inapplicable- to a certain class of suits.”).
A. The Doctrine of Ex Parte Young and Its Application
The theory (and controversy) behind the doctrine of Ex parte Young has been discussed at length in cases from both this and the Supreme Court, not to mention in the academic literature, and does not require further explication. See, e.g., Idaho v. Coeur d’Alene Tribe of Idaho, 521 U.S. 261, 269-78, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (opinion of Kennedy, J.); id. at 291-96, 117 S.Ct. 2028 (O’Connor, J., concurring); Green v. Mansour, 474 U.S. 64, 68-70, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); Edelman, 415 U.S. at 663-68, 94 S.Ct. 1347; In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 372 (2d Cir.2005). See generally 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4231 (2d ed. 1988 & Supp.2005). Suffice it to say that the doctrine remains a landmark of American constitutional jurisprudence that operates to end ongoing violations of federal law and vindicate the overriding “federal interest in assuring the supremacy of that law.” Green, 474 U.S. at 68, 106 S.Ct. 423; see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).
In contrast to its theoretical underpinnings, application of the Young doctrine is straightforward: A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) “alleges an ongoing violation of federal law” and (b) “seeks relief properly characterized as prospective.” Verizon, 535 U.S. at 645, 122 S.Ct. 1753; Dairy Mart, 411 F.3d at 372.
Here, application of the straightforward inquiry suggests that the Eleventh Amendment does not prevent suit against the Superintendent. The gravamen of the Agency’s petition is that the Superintendent is committing an ongoing violation of federal law by taking possession of and retaining assets that — under 11 U.S.C. § 304(b) & (c) (empowering a bankruptcy court to enjoin such proceedings and order turnover of the assets, and outlining the legal standards pursuant to which this relief may be granted) — must be released to the Agency, the foreign representative of the Banks, for foreign insolvency proceedings. This allegation is plainly “neither insubstantial nor. frivolous” as a legal claim, and thus satisfies the first requirement of the Ex parte Young doctrine. See Dairy Mart, 411 F.3d at 374. Moreover, it is undisputed that the injunctive relief sought — turnover of the assets and enjoin *619 ment of any state insolvency proceedings — is prospective in nature, satisfying the second prong of the inquiry. The Superintendent does not argue that the relief is retrospective or designed to compensate for a past violation of federal law, nor does she contend that any turnover of the assets would even minimally deplete New York’s public fisc. See Aff. of Muccia, First Deputy Superintendent ¶¶ 53-55 (Aug. 15, 2002); Verizon, 535 U.S. at 646, 122 S.Ct. 1753 (relief sought was prospective where it did not impose upon the state “a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials” (citing Edelman, 415 U.S. at 668, 94 S.Ct. 1347)); N.Y. City Health & Hosp. Corp. v. Perales, 50 F.3d 129, 135 (2d Cir.1995). In short, a prima facie ease for permitting suit under Ex parte Young is here established.
B. Appellant’s Objections to Application of Ex Parte Young
Appellant Superintendent raises two objections to the application of Ex parte Young, which we discuss and ultimately reject below.
1. The Quiet Title Objection
The first of these is that the assets belong to the state by operation of New York law, thus transforming the § 304 petition into the functional equivalent of an action to quiet title implicating “special [state] sovereignty interests.” See Coeur d’Alene Tribe, 521 U.S. at 281-82, 117 S.Ct. 2028. The Superintendent avers that when she took possession of the assets pursuant to New York Banking Law § 606(4)(a), that statute also automatically vested title of the same in the State of New York. She argues that because a federal court is generally prohibited by the Eleventh Amendment from adjudicating a state’s claim of title, Ex parte Young notwithstanding, the Eleventh Amendment presents a bar to this action that the doctrine cannot overcome. See Coeur d’Alene Tribe, 521 U.S. at 281-82, 117 S.Ct. 2028.
The argument is misconceived. In the first place, New York Banking Law § 606(4)(a) vests title not in the state, but in the Superintendent. Further, the Superintendent does not claim that either the state — or she on its behalf — has the right to beneficial ownership in these assets. Regardless of § 606(4)(a)’s use of the word “title,” the Superintendent’s claim is in fact of a right to custody of the assets for purposes of administration during insolvency proceedings. There may well be, as the Superintendent contends, strong arguments that the Eleventh Amendment precludes a quiet title suit in federal court against a state, absent state consent, based on the fact that such an action would adjudicate the state’s .beneficial ownership of property, regardless of whether it is nominally asserted against a state official. See Restatement (Second) of Judgments § 30 & cmt. a (1982); Ray Andrews Brown, The Law of Personal Property § 21 (2d ed.1955); see also Nat’l Cancer Hosp. of Am. v. Webster, 251 F.2d 466, 467 (2d Cir.1958) (L.Hand, J.).
However, arguments of this nature have never prevented a federal court from providing relief from governmental officials taking illegal possession of property in violation of federal law. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 696-98, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (“[S]pecific relief in connection with property held or injured by officers ... acting in the name of the sovereign has been granted ... where there was a claim that the taking of the property ... was not the action of the sovereign because unconstitutional or beyond the officer’s statutory powers.”); Fitts v. McGhee, 172 U.S. 516, 529, 19 S.Ct. 269, 43 L.Ed. 535 (1899); Tindal v. Wesley, 167 U.S. 204, 223-24, 17 S.Ct. 770, 42 L.Ed. 137 (1897); *620 United States v. Peters, 9 U.S. (5 Cranch) 115, 139-40, 3 L.Ed. 53 (1809) (Marshall, C.J.); cf. United States v. Lee, 106 U.S. 196, 218-19, 1 S.Ct. 240, 27 L.Ed. 171 (1882) (allowing an action in ejectment to proceed against two federal officers). As Justice O’Connor has explained, there is a difference between possession of property and title to property. Coeur d’Alene Tribe, 521 U.S. at 290, 117 S.Ct. 2028 (O’Connor, J., concurring). A court may find that an official has no legal right to remain in possession of property, “thus conveying all the incidents of ownership to the plaintiff,” but without “formally divesting the State of its title.” Id. That is the teaching of Tindal and Lee, in which “the Court made clear that the suits could proceed against the officials because no judgment would bind the State.” Id.; Tindal, 167 U.S. at 223-24, 17 S.Ct. 770; Lee, 106 U.S. at 222; see Fla. Dep’t of State v. Treasure Salvors, Inc., 458 U.S. 670, 687-88, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) (plurality opinion).
Applying these principles to the case at hand, it is apparent that this bankruptcy petition, which seeks turnover of assets allegedly held in violation of 11 U.S.C. § 304, is not a quiet title action against the state but rather a prayer for relief to dispossess a state official of assets and some of the incidents of ownership thereof under authority of controlling federal law. Granting an injunction against the Superintendent might require her to turn over the assets, but it would not decree any claim of title against the state. The § 304 petition proceeds, in other words, on a classic application of Ex parte Young.
Coeur d’Alene Tribe is not to the contrary. In that case, the Supreme Court held that a suit, ostensibly seeking prospective injunctive relief under Young, could not invoke the doctrine to bring what amounted to the functional equivalent of a quiet title action and thereby extinguish Idaho’s right to regulate submerged lands, “lands with a unique status in the law.” 521 U.S. at 281, 283, 117 S.Ct. 2028; see W. Mohegan Tribe and Nation v. Orange County, 395 F.3d 18, 21-22 (2d Cir.2004) (per curiam). More was at stake than simple possession or other incidents of ownership. The Indian tribe sought relief that “would bar the State’s principal officers from exercising their governmental powers and authority over the disputed lands and waters,” extinguishing state regulatory control over a “vast reach of lands and waters long deemed by the State to be an integral part of its territory.” Coeur d’Alene Tribe, 521 U.S. at 282; see id. at 290-91, 117 S.Ct. 2028 (O’Connor, J., concurring) (“When state officials are found to have no right to possess a disputed parcel of land, the State nevertheless retains its authority to regulate uses of the land. Here, the Tribe seeks a declaration not only that the State does not own the [submerged lands], but also that the lands are not within the State’s sovereign jurisdiction.”). The Court concluded
It is apparent, then, that if the Tribe were to prevail, Idaho’s sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the Young exception inapplicable.
Id. at 287, 117 S.Ct. 2028 (Opinion of the Court) (emphasis added). This case raises no comparable “special [state] sovereignty interests,” id. at 281, 117 S.Ct. 2028. The placement of the insolvent Banks’ assets under the control of the federal bankruptcy court for administration, rather than in the hands of the New York State Superintendent, does not affect any claim the state may have to beneficial ownership of those assets, and does not involve the types of state concerns that underlay the judgment *621 in Coeur d’Alene Tribe. The Superintendent’s objection is thus without merit.
2. The Objection That No Violation of Federal Law Is Alleged 15
On multiple fronts, the Superintendent urges us to confront the legal issue of whether § 304 of the Code contemplates application to state foreign-bank insolvency proceedings. The district court, reversing the bankruptcy court, held that it did. We express no opinion on the correctness of that holding, for our inquiry is limited to whether the ongoing violation of federal law alleged is “a substantial and not frivolous claim,” which surely it is. See Dairy Mart, 411 F.3d at 374.
Boiled down, appellant’s argument is that no ongoing violation of federal law has been alleged because § 304 does not apply to the Superintendent’s liquidation of the assets. This point is clearly foreclosed by Verizon, in which the Supreme Court explained that “the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim.” 535 U.S. at 646, 122 S.Ct. 1753. There, the Supreme Court rejected the Fourth Circuit’s suggestion that Verizon’s claim could not be brought under Ex parte Young because a state utility commission’s order enforcing a disputed contract was probably not inconsistent with federal law. Id. The court of appeals had doubted the existence of a federal law violation because it believed that state contract law, rather than federal telecommunications law, applied to and controlled the disputed contract and that the state commission’s order enforcing the contract did not violate the Telecommunications Act of 1996. See id. Similarly, appellant believes state banking law, rather than federal bankruptcy law, applies to and controls the liquidation of the foreign banks’ assets and that the Superintendent’s retention of the assets does not violate the Bankruptcy Code. Verizon is demonstrably on all fours with the present case.
The appellant’s belief in the nonexistence of a federal law violation simply does not speak to “whether suit lies under Ex parte Young,” because ordinarily an allegation of an ongoing violation of federal law is sufficient for purposes of the Young exception. Verizon, 535 U.S. at 646, 122 S.Ct. 1753. Our inquiry concerning such allegations is limited to whether the alleged violation is a substantial, and not frivolous, one; we need not reach the legal merits of the claim, Dairy Mart, 411 F.3d at 374. Here, no argument is presented that the Agency’s claim is frivolous or insubstantial — a doubtful proposition at best, when after thorough and careful briefing on the issue, two federal judges arrived at opposite conclusions. The Superintendent’s objection on this ground is rejected.
Ill Scope of Appellate Review Over the Legal Merits
Finally, a loose end. Appellant contends that we may reach out to decide the statutory question whether § 304 applies to the Superintendent’s liquidation of the foreign banks’ assets (again, the very issue she attempted to fold into her Ex parte Young objection) under the Supreme Court’s decision in Vermont Agency of Natural Resources v. United States, 529 U.S. 765, 779-80, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).
In Vermont Agency, the Court found it appropriate to consider the statutory question whether under the False Claims Act a state was a person for purposes of qui tarn liability, prior to the question of whether the Eleventh Amendment barred suit. Id. at 780, 120 S.Ct. 1858. As indicated earlier in this opinion, we do not decide the applicability of the Eleventh Amendment to these § 304 proceedings. Nonetheless, *622 it is appropriate for us to consider the Superintendent’s argument that the statutory question is open to us on interlocutory appeal, because if decision on the statutory question were to go in appellant’s favor, then these proceedings are properly dismissed for failure to state a claim, whether or not they may be brought under the doctrine of Ex parte Young. Appellant contends the § 304 statutory question likewise may be considered as part and parcel of, and antecedent to, our Eleventh Amendment inquiry. This contention is flawed on multiple levels.
As we have explained, the Eleventh Amendment analysis generally proceeds in two steps, the first of which is determining whether Congress has “unequivocally expressed” its intention to abrogate the states’ sovereign immunity. See Lane, 541 U.S. at 517, 124 S.Ct. 1978. In Vermont Agency, the Supreme Court found that the first step encompassed, in addition to what it called the “Eleventh Amendment inquiry,” that is, whether Congress had expressly abrogated state sovereign immunity, the “statutory inquiry,” that is, whether “the statute itself permits the cause of action it creates to be asserted against States (which it can do only by clearly expressing such an intent).” 529 U.S. at 779, 120 S.Ct. 1858. The Court viewed the two questions as basically identical, since “[t]he ultimate issue in the statutory inquiry is whether States can be sued under [the] statute,” while “the ultimate issue in the Eleventh Amendment inquiry is whether unconsenting States can be sued under [the] statute. This combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first. ” Id. at 779-80, 120 S.Ct. 1858 (emphasis added).
Here, it is quite doubtful that there is any logical priority or virtual coincidence in scope between the statutory inquiry whether Congress aimed for § 304 to apply to state foreign-bank insolvency proceedings, and the Eleventh Amendment inquiry whether Congress planned for § 304 to apply to unconsenting states. A hypothetical consideration of the consequences of deciding the § 304 statutory issue, in appellant’s favor, will make this point clearer.
Resolution in appellant’s favor on the statutory question would result in a judgment that § 304 does not apply to foreign banks that operate a business within the United States. See 11 U.S.C. §§ 109(b)(3) & 304(b)(1). Such a judgment, however, would do far more than simply answer “the question whether the statute itself permits the cause of action it creates to be asserted against States.” Vermont Agency, 529 U.S. at 779, 120 S.Ct. 1858 (emphasis removed); cf. id. at 787-88, 120 S.Ct. 1858 (holding that the False Claims Act does not permit suit against the states because a state is not a “person” for purposes of the Act). In effect, it would preclude § 304 petitions that requested turnover of assets held by any entity, provided the assets belonged to a foreign bank that operated a domestic business. In fact, the Superintendent concedes that her reading of § 304 would preclude petitions requesting turnover of assets seized by federal, not just state, regulatory authorities, and in this very case appellant seeks to have dismissed (and her reading of the statute would cause to dismiss) § 304 petitions that request turnover of assets from several private banks. None of this has anything to do with “whether States can be sued under [§ 304].” Vermont Agency, 529 U.S. at 779, 120 S.Ct. 1858 (emphasis added). These consequences amply demonstrate that, were we to decide the statutory question, the effect of our judgment would reach well “beyond the issues and persons that would be reached under the Eleventh Amendment *623 inquiry anyway,” traversing the rationale of Vermont Agency. See id. (permitting review of the statutory question because “there is no realistic possibility that addressing the statutory question will expand the Court’s power beyond the limits that the [Eleventh Amendment’s] jurisdictional restriction has imposed”). In short, Vermont Agency is not in point and appellant’s citation to its authority is unavailing.
Finally, appellant erroneously conflates the scope of our review set forth in Vermont Agency and Verizon for addressing the legal merits of her claim. In appellant’s view, both cases state the same scope of review: Appellate courts, sitting in interlocutory review of an Eleventh Amendment denial of immunity, may decide “the predicate question of whether the federal statute applies in the first place” but not “whether [the state’s] conduct violated the statute.” The Superintendent’s basic error lies in her failure to appreciate that the two standards in Verizon and Vermont Agency correspond to two separate issues. The Verizon standard applies only in the context of testing whether a suit may go forward under Ex parte Young, regardless of whether the Eleventh Amendment bars suit. See Verizon, 535 U.S. at 646, 122 S.Ct. 1753. On the other hand, the Vermont Agency standard applies when, directly confronting the Eleventh Amendment question, a court is determining whether Congress has “clearly expressed]” its intent to abrogate state sovereign immunity. See Vermont Agency, 529 U.S. at 779, 120 S.Ct. 1858.
Moreover, not only do the two standards address different issues, they also are different in substance. When a court reviews the legal merits of a claim for purposes of Ex parte Young, it reviews only whether a violation of federal law is alleged; appellate review of allegations is necessarily deferential, and only frivolous and insubstantial claims will not survive its scrutiny. See Dairy Mart, 411 F.3d at 374. When, however, a court reviews the legal merits for purposes of the Eleventh Amendment, as such, the scope of its review is strictly limited to whether Congress has “unequivocally expressed” its intention to abrogate state sovereign immunity and whether the legislation is enacted “pursuant to a valid grant of constitutional authority.” Lane, 541 U.S. at 517, 124 S.Ct. 1978. That limitation was not expanded by the holding of Vermont Agency. Rather, Vermont Agency explained that there are circumstances in which the unequivocally expressed inquiry runs coterminous with the legal merits inquiry, as when the merits question is whether the statute was intended to apply to the states as such. See Vermont Agency, 529 U.S. at 779-80, 120 S.Ct. 1858.
This has been a relatively long discussion on a rather simple and settled matter. But it is our hope that clarification of the principles concerning the scope of our review in this context will be helpful to future litigants coming before us.
CONCLUSION
We have considered carefully the other arguments of the parties and find them to be either unnecessary to the appeal’s resolution or without merit.
Affirmed.

. Section 304 of the Bankruptcy Code, 11 U.S.C. § 304, has been repealed and replaced by various provisions in the new chapter 15 of Title 11. See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, § 802(d)(3), 119 Stat. 23, 146. As the new provisions are largely inapplicable to this case, see id. § 1501, 119 Stat. at 216, we refer throughout this opinion to the version of the Code prior to the 2005 amendments, viz, Title 11, U.S.C. (2000).