# United States Court of Appeals

## For the First Circuit

No. 15-1555

IN RE: GRAND JURY PROCEEDINGS

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Kayatta, Selya, and Dyk,[*]
Circuit Judges.

Timothy E. Zerillo, with whom Hallet, Zerillo & Whipple, P.A., was on brief, for intervenor-appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty, II, United States Attorney, was on brief, for appellee.

September 4, 2015

[*]Of the Federal Circuit, sitting by designation.

**DYK, Circuit Judge**.    Appellant is the target of an ongoing grand jury investigation into an alleged scheme to defraud investors regarding the salvaging of a sunken vessel.  The district court granted the government's motion to compel the production of documents from appellant's attorneys in connection with the grand jury investigation and granted the government's motion for a judicial determination that the crime-fraud exception applied to materials seized from appellant's home.    The district court rejected appellant's claim of attorney-client privilege, holding that the crime-fraud exception applied.    Although appellant requested *in camera* review of the documents that were the subject of the motion to compel, neither appellant nor appellant's attorneys ever produced the privilege log required under the Federal Rules.  We affirm.

## I.

The P.N.[1] is a British cargo ship that was sunk by a German U-boat off the coast of Massachusetts on June 16, 1942.[2]

---

[1]    To preserve the confidentiality of grand jury proceedings, see Fed. R. Crim. P. 6(e), we use initials, as agreed by the parties, to refer to the relevant individuals and vessels.

[2]    Much of the factual background for this case derives from an affidavit from Federal Bureau of Investigation Special Agent Mark Miller (the "Miller affidavit") that was attached to the government's February 19, 2015, motion to compel evidence from appellant's attorneys.    Appellant's response to the motion to compel attached a November 25, 2014, affidavit that had previously been filed in an associated admiralty action, but did not attach a counter affidavit to the Miller affidavit.    Both parties incorporated the facts and arguments from the motion to compel into

-2-

The government contends that appellant and appellant's company, S.H., raised $8 million from investors to salvage the P.N. by falsifying documents to make it appear as though the ship contained valuable cargo.  Appellant currently contends that S.H. discovered the P.N. "[i]n approximately 2007."[3]  E.M., who is now a witness for the government, is a shipwreck researcher hired by appellant to research the P.N.  The government contends that appellant conspired with E.M. to falsify documents related to the P.N.'s cargo to defraud investors, whereas appellant contends that E.M. falsified the documents without appellant's knowledge.  According to appellant, appellant first learned during a November 23, 2014, telephone conversation with E.M. that the documents had been altered.

The government asserts that the fraudulent activity dates back to August 29, 2006, the date that E.M. purchased Volume III of Lloyd's War Losses, a compendium of information about merchant ships owned by British, allied, and neutral countries that were

_____

their briefing on the motion for a judicial determination.

    [3]    Appellant has previously reported various dates for the discovery of the P.N.  In a May 2008 confidential offering summary, appellant claimed that the P.N. was discovered on May 5, 2007.  This May 5, 2007, date was repeated in a December 5, 2012, confidential offering summary.  In a September 10, 2012, amended complaint in an admiralty action relating to the P.N., appellant claimed that S.H. "first located the wrecksite of the [P.N.]" in April of 2008.  And at a January 7, 2014, deposition, appellant testified that S.H. discovered the wreck at "the end of 2007," and that appellant "think[s] it was in September."

sunk or destroyed during World War II. According to E.M., appellant paid E.M. to purchase a copy of Lloyd's War Losses. The original entry for the P.N. from Lloyd's War Losses indicated that the ship sank on June 16, 1942, and listed her cargo as "1600 tons automobile parts & 4000 tons military stores." According to E.M., E.M. showed the entry to appellant who said that E.M. "needed to show more to get investors on board." E.M. "altered an image of the [P.N.] entry in Lloyd's War Losses to indicate that the ship was carrying 1,707,000 troy ounces of platinum." E.M. also admitted to heavily redacting the remainder of the document and adding a forged "declassification" stamp to conceal its origin. As discussed below, the altered document was later used to secure money from investors and was filed in the associated admiralty proceeding.

In May 2008, S.H. produced a confidential offering summary for potential investors. The summary claimed to have discovered the P.N. on May 5, 2007, and stated that "[i]ncluded in the bounty are seventy-one tons of platinum and a very real possibility of ten tons of gold bullion." It added that the ship's "manifest records" revealed that 1.5 tons of industrial diamonds were also aboard the ship with an "[u]nknown value at this time."[4]

---

[4] Appellant later testified that the information about diamonds aboard the ship "was just speculation."

On August 19, 2008, S.H. filed an admiralty claim in federal district court seeking a warrant for the arrest of the P.N. and salvage or ownership rights to it. A claim for salvage requires three elements: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success." The "Sabine", 101 U.S. 384, 384 (1879); see also Clifford v. M/V Islander, 751 F.2d 1, 5 (1st Cir. 1984). "To obtain possession over the *res*, district courts sitting in admiralty may issue a warrant of arrest for a physical part of a shipwreck (an 'artifact') and, based on this arrest, exercise constructive jurisdiction over the entire shipwreck." Great Lakes Exploration Grp., LLC v. Unidentified Wrecked & (For Salvage-Right Purposes), Abandoned Sailing Vessel, 522 F.3d 682, 694 (6th Cir. 2008).

In its complaint in the admiralty action, S.H. claimed to be the salvor-in-possession of the P.N. and that it had effected the arrest by recovering six "metal pieces" from the vessel. The United Kingdom appeared in the action, claiming ownership of the P.N. On August 26, 2008, the court issued the requested warrant naming S.H. salvor-in-possession of the ship based on the purported recovery of the six metal pieces on April 21, 2008.

Although the arrest warrant established the admiralty court's *in rem* jurisdiction over the P.N., it did not settle the

parties' ultimate rights, and the admiralty action continued with respect to that question.  See Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 697 (1982) ("Of course, the warrant itself merely secures possession of the property; its execution does not finally adjudicate the State's right to the artifacts.").

The nature and value of the P.N.'s cargo was pertinent to the admiralty proceeding because "[t]he value of the property saved" is a factor in determining the amount of the salvage award. The Blackwall, 77 U.S. 1, 14 (1869); see also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 286 F.3d 194, 204 (4th Cir. 2002) ("Courts have held that [a salvage] award cannot exceed the value of the property itself."); Allseas Maritime, S.A. v. M/V Mimosa, 812 F.2d 243, 246 (5th Cir. 1987) ("The salvage award is . . . limited by the value of the property saved . . . ."); Lambros Seaplane Base v. The Batory, 215 F.2d 228, 234 (2d Cir. 1954) ("[A]mongst the factors which affect a salvage claim are the values . . . of the vessel or property saved . . . .").

On or about February 14, 2011, S.H. issued a second confidential offering summary for potential investors, repeating the prior claims about the P.N.'s cargo and adding that S.H. had a claim to the shipwreck because it had "filed an arrest warrant in the U.S. Federal Court."  In response to the question of to whom "the material (cargo) belong[ed]," the same offering summary explained that "[i]f the original owner or owners are known or the

-6-

salvor desires not to dispute a third party's title claim to the wreck, then the salvor will seek a recovery award under the law of salvage, a well-established doctrine with significant international legal precedent, that has been in [the] past around 90% of the recovery."

In 2011, E.M.'s company, in a further effort to substantiate the claim that the P.N. contained valuable cargo when it sank, contracted with R.L., a private archival researcher, to review National Archives and Records Administration ("NARA") records regarding the P.N. and other vessels. On February 15, 2012, E.M. forwarded R.L.'s February 14, 2012, email to appellant, which indicated that R.L. had copied "cargo reports" "for earlier trips only."

On February 19, 2012, E.M. sent appellant a document that was purportedly "the last cargo of the [P.N.]" and was "on file at the National Archives." The document was titled "Cargo, Mail, and Passenger Report" (the "Cargo Report") and was date-stamped "FEB 6 1941" [not 1942, the date of the sinking]. Adjacent to a box labeled "GENERAL CARGO," the document contained a reference to "BULLION."

In a June 19, 2012, status report filing in the admiralty case, S.H. attached three altered documents: (1) the altered document derived from <u>Lloyd's War Losses</u> labeled as a "Copy of US Treasury Ledger–Listing Platinum as cargo" (the "Treasury Ledger");

-7-

(2) a version of the Cargo Report purportedly from the P.N.'s final voyage that removed or completely obscured the "FEB 6 1941" date-stamp; and (3) a third document, a purported copy of a "US Treasury Department, Procurement Division" cargo listing (the "Treasury Procurement") altered to show that the P.N. contained 741 platinum bars and 4,889 gold bullion bars. A September 10, 2012, amended complaint in the admiralty case referred to the "[o]fficial documents of the United States Customs Service and the United States Treasury Department," which "contain a list of (at least part) of the commercial cargo being transported" and were "attached to the [June 19, 2012, status report]." According to E.M., appellant "pressured [E.M.] to alter the documents based on demands that [S.H.] was facing from potential investors who were interested in the [P.N.]."

S.H. issued a third confidential offering summary on December 5, 2012, attaching the same three documents (the Treasury Ledger, Cargo Report, and Treasury Procurement) that had been filed with the admiralty court, referring to them in the table of contents as "SMOKING GUN DOCUMENTS" and as evidence of valuable cargo aboard the P.N. This summary claimed that a remote-operated vehicle had entered the ship and the "bullion boxes [we]re then located." It also noted that "a federal admiralty claim has been issued" regarding the P.N.

-8-

In a January 25, 2013, objection to the admiralty court's scheduling order, counsel for the United Kingdom questioned the authenticity of the documents. According to E.M., on or about June 24, 2013, E.M. traveled to NARA in Maryland at appellant's request to have copies of E.M.'s altered Treasury Procurement stamped with a NARA seal. Around the same time, NARA investigators reviewed the Treasury Procurement and Cargo Report from E.M. and concluded that they were fraudulent. NARA investigators located an original copy of the Cargo Report which, unlike the copy filed with the admiralty court, made no mention of bullion. An August 29, 2013, status report filed by S.H. in the admiralty action noted that E.M. attempted "to secure a certified copy of the [Treasury Procurement] document from the National Archives" but was "unsuccessful," such that "the validity of the document must remain in question."

On October 15, 2013, one of appellant's attorneys in the admiralty matter, Attorney D.H., moved to withdraw, citing a "fundamental disagreement" with "the client regarding how this action should be conducted," and that motion was granted. Attorney D.H. also sent an October 16, 2013, email to appellant and appellant's two remaining attorneys (Attorney G.B. and Attorney M.T.) entitled "False Smoking Gun Documents" and attached altered and unaltered versions of the Treasury Procurement document that had been filed in the admiralty matter. Attorney D.H. noted that "[t]hese issues were found by [Attorney D.H.'s associate] and

required [Attorney D.H.'s] withdrawal" because Attorney D.H. "d[id] not believe that the primary documents came from the archives." On the same day as Attorney D.H.'s email, Attorney G.B. moved to withdraw as counsel in the admiralty matter, and that motion was granted.

On October 22, 2013, appellant forwarded the February 19, 2012, email from E.M. that attached the Cargo Report to K.L., a former S.H. vessel crew member. Appellant asked K.L. to review the documents from E.M. to assess their legitimacy. At a meeting in or around November 2013, K.L. informed appellant and an investor that K.L. believed the documents were falsified, and, according to K.L., appellant "appeared upset but not surprised by [K.L.'s] findings."

On February 11, 2014, S.H. filed another status report in the admiralty action, which referred the court to the three documents filed on June 19, 2012, and explained that S.H. had been unable to verify the source of (or find an unredacted copy of) the Treasury Ledger or Treasury Procurement documents. In this status report, appellant also indicated that because the Cargo Report was dated in 1941, it did not relate to the P.N.'s final voyage in June 1942. Appellant filed a supplemental affidavit on June 12, 2014, claiming that appellant did not know in June 2012 that an unaltered version of the Cargo Report document existed.

On November 14, 2014, NARA agents interviewed E.M. On November 23, 2014, the government recorded a conversation between

appellant and E.M. During that conversation, appellant indicated that appellant was aware of the existence of a criminal investigation, an awareness which apparently colored the ensuing exchange. E.M. informed appellant that his earlier statements that a former federal agent (named J.M.) had led E.M. to the documents at issue was inaccurate. Later in the same conversation, the following exchange occurred:

> E.M.: Mm-hmm. Yeah, but I mean, you knew—you knew those documents were fake a long time ago, you know?
> APPELLANT: Not 100 percent, I didn't.
> . . .
> APPELLANT: No, we didn't [E.M.]. I'm telling you, we didn't. I've stuck up for them because I do not—that's why I stuck up for them because I had an idea, but I have no proof. The only proof I have is what you said this morning, right now.
> E.M.: Well, we discussed it.
> APPELLANT: What? Forging documents?
> E.M.: No, we didn't say it in those words.
> APPELLANT: Exactly. We didn't. You're right.

On December 4, 2014, the government executed a search warrant at appellant's home, seizing six metal pieces in addition to numerous computers and electronic media storage devices. And on December 22, 2014, a NARA agent interviewed the captain of the S.W. vessel (which was supposedly used by S.H. to recover the six metal pieces), who stated that no material was recovered from the P.N. while he was captain. Another crew member aboard the S.W. vessel at the time of discovery and for two subsequent trips stated that no material was recovered from the P.N. during those trips.

-11-

In February 2015, the government served grand jury subpoenas on three of appellant's admiralty lawyers (Attorney M.T., Attorney D.H., and Attorney G.B.) and their law firms for materials "from 2006 until the present," including all documents provided by S.H. and communications with S.H. regarding the P.N.[5] Appellant's lawyers asserted the attorney-client privilege and work-product protection[6] in response, and on February 19, 2015, the government filed a motion to compel and a separate motion requesting a

---

[5]   The subpoena requested, *inter alia*, the following materials:
1. All documents, video, artifacts or other tangible material provided to you by [S.H.] relating to the [P.N.], the salvage thereof, or the solicitation of investments in [S.H.] relating to the salvage of the [P.N.], including historical documents, photographs, charts, maps, illustrations, ship artifacts, and any log books for the [S.W. vessel], [S.H. vessel], or any other vessel/ROV utilized by [S.H.].
2. All records of communications between [S.H.] and you, or between you and other attorneys representing [S.H.], regarding the [P.N.], the contents of the [P.N.]'s cargo, the salvage of the [P.N.], [the admiralty suit], or the solicitation of investments relating to the salvage of the [P.N.], including but not limited to e-mail, letters, voicemails, and notes or memoranda relating to conversations.
3. All law firm records, including but not limited to memoranda, notes, e-mails, voicemails, billing records, and calendar entries relating to your firm's representation of [S.H.] with respect to the formation of or investments in any [S.H.] entity, the salvage of the [P.N.] or [the admiralty suit].
4. Drafts of pleadings and supporting exhibits, including affidavits, filed on behalf of [S.H.] in [the admiralty suit].

[6]   Appellant has similarly asserted that the work-product protection applies here.  For convenience, we have omitted discussion of the work-product protection, which the district court did not specifically address.

-12-

determination that the materials seized from appellant's home fell under the crime-fraud exception.[7]  The government attached the Miller affidavit, which summarizes the investigation of appellant and E.M.

On February 20, 2015, appellant filed a motion to intervene asserting the attorney-client privilege, which was granted.[8]  On March 4, 2015, appellant filed an opposition to the government's motion to compel, joined by Attorney M.T.  In that opposition, appellant argued for the first time that although the government had not requested *in camera* review, if the court was "inclined to grant the Motion [to compel], it is hard to imagine the Court doing so before an *in camera* review has occurred."

Attorney D.H. and Attorney G.B. did not file a response in opposition to the government's motion to compel.  At a March 26, 2015, hearing before the district court on the motion to compel, the government represented that Attorney D.H. and Attorney G.B. "are asserting the attorney-client privilege with respect to the

---

[7]     Because the parties agreed that the motion for a judicial determination raised identical issues to the motion to compel, both parties adopted the facts and argument set forth in the briefing on the motion to compel in the motion for a judicial determination.

[8]     Appellant asserts that appellant was the privilege-holder here, as opposed to S.H., a limited partnership "organized for the specific purpose of salvaging the cargo of the [P.N.]."  The subpoena defined S.H. to include, *inter alia*, appellant and E.M. For privilege purposes, neither appellant nor the district court has distinguished appellant and S.H., the company owned by appellant.

requested materials but are prepared to produce them upon a requisite court order, and they do not feel the need to be heard in opposition to the motion. They simply wanted the order in order to comply with their professional responsibility obligations." Neither appellant nor appellant's attorneys have filed a privilege log or otherwise identified any specific documents subject to the subpoena that they contended were not subject to the crime-fraud exception.

On March 11, 2015, S.H.'s remaining attorney in the admiralty action, Attorney M.T., moved to withdraw (like the other two attorneys who withdrew in 2013), and the motion was granted.

On April 17, 2015, the district court granted the government's motion to compel and the government's motion for a judicial finding that the crime-fraud exception applied to evidence seized from appellant's home,[9] finding that the government had proffered prima facie proof that (1) appellant "participated in a fraud," and (2) "that the admiralty action was connected to the fraud." The court relied on the Miller affidavit in finding sufficient evidence that appellant participated in a fraud by submitting falsified documents to the admiralty court showing that the P.N. was carrying valuable cargo and claiming that "war

---

[9] The district court limited the second subpoena category to omit the first reference to the P.N., because this category otherwise "may ensnare material unrelated to [appellant's] planning and engagement in the salvage of the [P.N.], including the investment scheme and admiralty lawsuit associated with it."

records" showed that the P.N. was carrying valuable cargo. The district court also found evidence that the fraud began as early as 2006, based on the 2006 purchase of Lloyd's War Losses, which was the source of the fraudulent Treasury Ledger prepared in 2008. In addition, the court found that appellant had provided varying accounts of when the P.N. was discovered (see *supra* note 4), and that appellant's claim that S.H. recovered six pieces of metal from the P.N. was belied by statements by the S.W. vessel's captain that no objects were recovered during that time period.

Based on this evidence, the district court rejected appellant's claim that appellant had been duped by E.M., "conclud[ing] that [the] government's evidence supports its belief that [appellant] was [E.M.]'s co-conspirator, and not [appellant's] victim." Finally, the district court found sufficient evidence that the admiralty claim was part of the fraud because "[t]here could be no salvage operation for investors to invest in without a judicial determination that [appellant] had a lawful claim to the ship's cargo." The district court did not address appellant's request for *in camera* review. On May 15, 2015, the admiralty case was dismissed with prejudice.

Appellant appeals the grant of both the government's motions. We review the district court's rulings on questions of law de novo, findings of fact for clear error, and evidentiary determinations for an abuse of discretion. In re Grand Jury

Subpoena (Mr. S.), 662 F.3d 65, 69 (1st Cir. 2011).

## II.

Ordinarily, we would not have appellate jurisdiction over the district court's order granting the government's motion to compel prior to a citation for contempt. See In re Grand Jury Subpoenas, 123 F.3d 695, 696 (1st Cir. 1997). We have jurisdiction in the circumstances of this case, however, pursuant to Perlman v. United States, 247 U.S. 7 (1918). As this court has noted:

> An exception to the rule requiring a contempt citation prior to appeal exists when subpoenaed documents are in the hands of a third party [the "Perlman doctrine"]. In that case, the owner of the documents may seek immediate appeal of a district court's order requiring production of those documents.

Grand Jury, 123 F.3d at 696-97 (citing Perlman, 247 U.S. at 12-13). This court has applied the Perlman doctrine to circumstances where, as here, "a client seeks immediate appeal of an order compelling production of a client's records from his attorney." Id. at 699; see also In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.), 274 F.3d 563, 570 (1st Cir. 2001).

With respect to the district court's declaratory order granting the government's motion for a judicial finding, we have jurisdiction because the declaratory order is a final judgment. See 28 U.S.C. § 2201 ("Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."); see also Langley v. Colonial Leasing Co. of New Eng., 707

F.2d 1, 3 (1st Cir. 1983) (declaratory judgment order which "was in reality a full final judgment" was appealable).

### III.

Appellant argues that the district court did not have a sufficient basis to find that appellant was engaged in a scheme to commit a crime or fraud.

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjon Co. v. United States, 449 U.S. 383, 389 (1981). In general, the burden is on appellant (as the party asserting the privilege here) to "establish the existence and applicability of the privilege . . . [using] sufficient information to allow the court to rule intelligently on the privilege claim." Marx v. Kelly, Hart & Hallman, P.C., 929 F.2d 8, 12 (1st Cir. 1991); see also Grand Jury, 662 F.3d at 69 ("The burden of showing that documents are privileged rests with the party asserting the privilege.").

"The crime-fraud exception—one of several qualifications to the attorney-client privilege—withdraws protection where the client sought or employed legal representation in order to commit or facilitate a crime or fraud." In re Grand Jury Proceedings, 417 F.3d 18, 22 (1st Cir. 2005). The government has the burden of establishing the application of the crime-fraud exception by

establishing "a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." Grand Jury, 417 F.3d at 23; see also In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 75 (1st Cir. 1999). "To bring the crime-fraud exception to bear, the party invoking it must make a prima facie showing: (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." Violette, 183 F.3d at 75. If the party asserting the crime-fraud exception makes this reasonable cause showing (also referred to as a prima facie case), the privilege is forfeited. See Grand Jury, 417 F.3d at 22-24.

Here, there was ample evidence for the district court to conclude under the applicable evidence standard that appellant was involved in a scheme to defraud investors as to the value of the cargo of the P.N. This included evidence that E.M. stated that the documents were falsified at appellant's direction, that the falsified documents were transmitted to potential investors and the admiralty court, that appellant's claim that the six metal pieces came from the P.N. was contradicted by the captain of the S.W. vessel that supposedly recovered them, and various other evidence from the Miller affidavit.

Appellant contends that the subpoena is temporally overbroad because it reaches back to documents beginning in 2006, but 2006 is the year that appellant identified as the year during which appellant supposedly learned "something remarkable about" the P.N. after "scouring through" various records, and the year in which appellant caused E.M. to purchase the copy of Lloyd's War Losses eventually employed to perpetuate the fraud. In light of what happened later, particularly appellant's direction to E.M. to utilize the Lloyd's War Losses book purchased in 2006 to perpetuate the fraud by altering its contents, it is reasonable to conclude that the fraud began in 2006.

And there was also sufficient evidence for the district court to conclude that at least some of the communications between appellant and appellant's attorneys with respect to the admiralty proceeding were intended by appellant to facilitate that fraudulent scheme. This included the fact that the fraudulently altered documents were filed with the court by counsel and that the admiralty action was referenced in various offering summaries. The admiralty proceeding itself would have been the source of any potential monetary recovery from the P.N., as S.H. represented to potential investors that it expected a salvage award amounting to approximately ninety percent of the value of the P.N.'s cargo.

Appellant argues that the district court failed adequately to consider contrary evidence that supported appellant's

contention that appellant was not involved in the crime or fraud. But this is clearly not so: the district court considered all evidence presented, and simply did not find appellant's evidence to be so compelling as to preclude a finding that there was a reasonable basis to conclude that appellant used appellant's lawyers to foster a fraud. As we have explained, ample evidence supported this finding.

**IV.**

Although we affirm the district court's conclusion that sufficient evidence exists to invoke the crime-fraud exception, that is not the end of the matter. Appellant alleges that the subpoena seeks documents that did not further the crime or fraud. In appellant's opposition to the government's motion to compel, appellant requested for the first time that the district court conduct an *in camera* review as an alternative to denying the motion. The district court did not address this request.

*In camera* review can perform two separate functions in the crime-fraud exception context. First, *in camera* review may be used to determine whether there is sufficient evidence to apply the crime-fraud exception to a claim of attorney-client privilege. In United States v. Zolin, 491 U.S. 554 (1989), the Supreme Court approved of the use of "*in camera* review to determine the applicability of the crime-fraud exception," upon "a showing of a factual basis adequate to support a good faith belief by a

-20-

reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." Id. at 572 (internal quotation, citation omitted). As discussed above, there was ample evidence here for the district court to conclude that the crime-fraud exception applied without the need to resort to *in camera* review, nor did appellant seek *in camera* review for this purpose. See Linder v. Nat'l Sec. Agency, 94 F.3d 693, 696–97 (D.C. Cir. 1996) ("A court may rely on affidavits in lieu of an *in camera* review when they are sufficiently detailed . . . ."). Importantly, this is not a case in which *in camera* review of the subject documents would have helped the district court decide the issue that the parties put before it: whether the crime-fraud exception generally applied.

Second, *in camera* review may be sought for a different purpose—to determine whether specific documents evidence communications with attorneys in furtherance of the crime or fraud. This is because the crime-fraud exception requires "that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." Grand Jury, 417 F.3d at 22 (quoting Violette, 183 F.3d at 75); see id. at 25 (suggesting the use of *in camera* review on remand to determine whether certain attorney-client communications were intended to perpetuate a crime or fraud).

-21-

Appellant apparently seeks *in camera* review here to identify documents that remain privileged notwithstanding the existence of the crime-fraud exception because they were not in furtherance of the crime or fraud.[10]

The question is whether appellant has preserved appellant's claim for *in camera* review. Under Rule 45 of the Federal Rules of Civil Procedure, applicable to grand jury subpoenas, "[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: . . . describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A). "The operative language is mandatory and, although the rule does not spell out the sufficiency requirement in detail,

---

[10] Appellant asserts that this includes certain documents (or portions of documents) relating to vessels other than the P.N. Documents relating solely to shipwrecks other than the P.N. are not within the scope of the subpoena, which is limited to materials "relating to" or "regarding the" P.N. and the associated admiralty suit. Appellant points to one aspect of the subpoena that might go beyond the P.N. and the associated admiralty suit: "[a]ll law firm records . . . relating to your firm's representation of [S.H.] with respect to the formation of or investments in any [S.H.] entity . . . ." As the government explains, however, appellant's affidavit represented that S.H. "was organized for the specific purpose of salvaging the cargo of the . . . [P.N.]," and "[a]ll of [S.H.'s] activities, and all documents generated or obtained by S.H., have related directly or indirectly to that [P.N.] salvage project." As such, this aspect of the subpoena is also limited to the P.N.

courts consistently have held that the rule requires a party resisting disclosure to produce a document index or privilege log." Grand Jury, 274 F.3d at 575.

Rule 45 does not specify when this description (normally in the form of a privilege log) must be provided. See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2464 (3d ed. 2008) ("One problem presented by Rule 45[] is that it fails to provide any guidance as to when the claim of privilege or work product must be asserted by the person subpoenaed."). Addressing this gap, the District of Columbia and Second Circuits have imposed a requirement that "the information required under the Rule is provided to the requesting party within a *reasonable time*, such that the claiming party has adequate opportunity to evaluate fully the subpoenaed documents and the requesting party has ample opportunity to contest that claim." Tuite v. Henry, 98 F.3d 1411, 1416 (D.C. Cir. 1996); see also In re DG Acquisition Corp., 151 F.3d 75, 81 (2d Cir. 1998) (citing and applying Tuite's "reasonable time" requirement). We agree that this is the appropriate standard.

Here, in opposing the government's motion for a judicial determination that the crime-fraud exception applied to materials seized from appellant's home, Rule 45 was inapplicable and appellant was not required to provide a privilege log to argue against the government's crime-fraud theory. And even with respect

to the government's motion to compel (governed by Rule 45), neither party thought that a privilege log was necessary at that stage to address the applicability of the crime-fraud exception to the documents generally. For purposes of the crime-fraud exception, the government simply assumed that the subpoena sought documents that would otherwise have been privileged. Under those circumstances, there was no need for a privilege log to address that general question, and appellant's failure to provide a privilege log in opposition to the motion to compel did not deprive appellant of the right to contest the government's overall crime-fraud theory.

However, when appellant asserted the need for an *in camera* inspection in assessing the motion to compel, appellant essentially requested that the court make a document-by-document ruling as to whether any particular document might not be discoverable notwithstanding general application of the crime-fraud exception. The failure to produce a privilege log (or otherwise identify particular documents subject to the privilege) to support the need for *in camera* inspection waived appellant's right to seek *in camera* inspection.

Neither appellant nor appellant's attorneys ever produced a privilege log in response to the motion to compel nor otherwise complied with the requirements of Rule 45. Under this court's cases, that constitutes a waiver of the request for *in camera*

review.  See Grand Jury, 274 F.3d at 576 ("A party that fails to submit a privilege log is deemed to waive the underlying privilege claim."); Grand Jury, 662 F.3d at 72; see also Corvello v. New Eng. Gas Co., 243 F.R.D. 28, 34 (D. R.I. 2007) ("[I]n camera inspection is unnecessary where the party claiming privilege has failed to make a prima facie showing that the documents in question are privileged by submitting a privilege log that adequately described the documents and the basis for the claimed privilege.").

The requirement to comply with Rule 45 applies even where, as here, the allegedly privileged documents are in the possession of the client's attorneys, rather than the client, and the client has either knowledge of or access to them.  As the attorneys' client (or former client), appellant had access to the attorneys' files.  See Me. Bar Rules § 1.16(d); ABA Model Rules of Prof. Conduct 1.16(d); see also Maine Professional Ethics Opinion 120; Maine Professional Ethics Opinion 51.  In Grand Jury, the allegedly privileged documents were in the possession of corporate counsel for the intervenor clients' parent company, but "the intervenors made no effort to prepare a privilege log" despite their "knowledge of the communications to which the subpoena pertained."  274 F.3d at 576.  We held that because "[p]rivilege logs do not need to be precise to the point of pedantry[,] . . . a party who possesses some knowledge of the nature of the materials to which a claim of privilege is addressed cannot shirk his

-25-

obligation to file a privilege log merely because he lacks infinitely detailed information. To the contrary, we read Rule 45[] as requiring a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres." Id. (emphasis added).

Here, appellant clearly "possesses some knowledge of the nature of the materials" sought by the subpoenas, id., because at least two of the subpoenaed categories were necessarily in appellant's possession at one point: communications between appellant's company and appellant's attorneys, and materials provided by appellant's company to appellant's attorneys. Because appellant failed to produce a privilege log or any other "descri[ption] of the nature of the withheld documents," Fed. R. Civ. P. 45(e)(2), appellant's request for *in camera* review was not preserved.

**AFFIRMED**

Costs to the United States.